**AUTOMATION AND MEASUREMENT DIVISION, THE BENDIX CORPORATION, Petitioner,**

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 17771, 18038.

United States Court of Appeals
Sixth Circuit.

Aug. 30, 1968.

John O. Henry, Dayton, Ohio, for petitioner; Hubert A. Estabrook, Francis X. Lee, Dayton, Ohio, on brief; Estabrook, Finn & McKee, Thomas B. Kreutz, Ernest T. Hix, Dayton, Ohio, of counsel.

Gary Green, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Corinna Lothar Metcalf, Atty., N.L.R.B., Washington, D. C., on brief.

Before WEICK, Chief Judge, and PHILLIPS and McCREE, Circuit Judges.

WEICK, Chief Judge.

In these consolidated cases, Bendix seeks a review of two decisions and orders of the Board. The first one found that Bendix's subsidiary, The Sheffield Corporation,[1] violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, (29 U.S.C. Sec. 151 et seq.) by refusing to bargain with the Union which had been certified by the Board, and the second which found that it violated Section 8(a) (5) and (1) of the Act by unilaterally announcing and effecting changes in wages, hours and working conditions without prior notice to or consultation with the Union. The Board's decisions and orders are reported at 163 N.L.R.B. No. 34 and 165 N.L.R.B. No. 132.

The principal issue in the cases is the validity of elections conducted by the

1. The subsidiary became the petitioner on October 1, 1966, but will be referred to as "Bendix".

Board in 1964 and 1965. Although the Board states in its brief that the results of the 1964 election were "inconclusive" the fact is that the Union lost by 34 votes.[2] The Union filed objections to the election alleging that Bendix interfered with the election by (1) threatening employees with loss of benefits if the Union were to win the election and (2) promising a wage adjustment if the Union were defeated. The Regional Director sustained the objections without a hearing and ordered a new election. The Board sustained the Regional Director without a hearing.

Prior to the second election Bendix moved for a supplemental hearing and for the opportunity to offer evidence on the issue of the exclusion from the bargaining unit of about 60 job leaders. These job leaders had always been included in the voting units in previous proceedings.[3] Neither the Company nor the Union had requested their exclusion but the Regional Director had ruled on his own initiative that the leaders were supervisors. This motion was denied.

Bendix, prior to the second election, filed with the Regional Director an unfair labor practice charge against the Union alleging that during the campaign for the first election the Union, in a handbill distributed to employees, had falsely stated that "the United States Government guarantees you that you will lose no benefits except those you wish to change" if you vote for the Union. The Regional Director dismissed the charge. The General Counsel for the Board sustained the Regional Director on March 4, 1965.

The second election was conducted on February 17, 1965. Job leaders were excluded from voting in sufficient numbers to have affected the results of the election. After conducting hearings on challenged ballots, the result was as follows:

| | | |
|---|---|---|
| No Union | — | 266 |
| Union | — | 278 |
| Difference | — | 12 |
| Remaining uncounted ballots — | | 11 |

The Company filed objections to the election again raising the issue of the exclusion of job leaders from the bargaining unit and also the misrepresentation by the Union to the employees in asserting that the United States Government and the National Labor Relations Board guaranteed certain minimum benefits. The Regional Director overruled the objections and ordered certification of the Union. The Company contended that the second election was illegal and refused to bargain with the Union.

### Campaign Statements

The Company did not welcome the advent of the Union. Unsuccessful efforts had been made to unionize the plant since 1945. The 1964 campaign was a heated one with charges and countercharges. The Union circulated among the employees about 60 handbills. The Company sent out ten letters and one copy of its publication "The Sheffield Gazette" to its employees.

The Union emphasized the benefits of Union membership while the Company endeavored to make clear the detriments. The Company also pointed out the many benefits which the employees had received from the Company over the years without a union.

The following excerpt from the Supplemental Decision and Direction of Second Election indicates the real reasons of the Regional Director for setting aside the first election.

"In other communications the Employer made clear to employees the results of unionization. The Employer's letter of June 8, 1964, includes the following,

'Bargaining with an International Union is a two-way street, and it is

2. 25 challenged ballots were not ruled on because they would not affect the election.

3. Efforts had been made to organize the plant since 1945. There had been five previous proceedings before the Board.

entirely possible that our Sheffield wages and benefit programs would be altered *upward or downward, created or eliminated,* as a result of this bargaining. Bargaining would have to begin from the *zero point,* item by item! If someone tells you that what you now have is guaranteed by the IEU or by some law, *he is not being factual!'*

"On the other hand, in the minutes of the factory Suggestion and Complaint Committee for July 7, 1964, the Employer stated its position in the event the Petitioner were rejected, as follows:

'In answer to inquiry about the usual November wage and benefit discussions, it was indicated that if the S & C committees are permitted to continue their independent representation of Sheffielders, suggestions toward improved compensation will be given through management consideration in light of economic conditions at that time.'

"In the same minutes the Employer's vice-president 'indicated that so far this has been a profitable year although the figures are not complete for June.' "

But the Union had responded to the Company's letter of June 8th in its handbills of June 12 and July 13, 1964, as follows:

[From the handbill dated June 12, 1964]

"Well we don't know what the Company calls zero * * * the IUE's and the United States Government's is where you presently are in wages, insurance, pensions, profit sharing and all other conditions of employment. There is only one way to go, and that is up.

Now, IUE doesn't ask you to just take our word on the Company taking away your benefits, but rather we ask you to take the word of the NLRB."

[From the handbill dated July 13, 1964]

"Q. Can we lose any benefits if we vote for the union?

A. IUE and the United States Government guarantees you that you will lose no benefits except those you wish to change. The Company can take away nothing. No IUE member has ever lost a benefit as a result of becoming a part of IUE."

The handbill of June 12th was a little more than one month before the election and the handbill of July 13th was two days prior thereto.

In a letter dated December 16, 1964, the Union in referring to the order of the Board setting aside the first election stated:

"This decision on the part of the Board should convince you that the Company cannot take away benefits you presently have * * * that bargaining starts from there upward. You have everything to gain and nothing to lose."

The Company's letter of June 8, 1964, stated that bargaining was a two-way street and that it was possible that wages and benefit programs would be altered upward or downward, created or eliminated as a result of this bargaining, and that bargaining would start from zero.

█ Contrary to the Board's ruling, we see nothing threatening or coercive for the Company to predict the possibilities or probabilities which might result from the collective bargaining process or from plant unionization. In the recent case of N.L.R.B. v. TRW-Semiconductors, Inc., 385 F.2d 753, 759–760 (9th Cir.1967) Circuit Judge Duniway, who wrote the opinion for the Court, said:

"[5, 6] As to the third theme, the statements that the union 'may not be able to keep all the fine things you now have,' that no one can assume that 'all the fine things we now enjoy would automatically be continued,' and that in bargaining the company 'would have to begin from scratch * * * to protect our competitive position'

are singled out by the trial examiner for special comment. He characterized them as 'clearly calculated to convey a message that their current fringe benefits would certainly be jeopardized,' and thus 'reasonably tending to trigger responses bottomed on fear' and therefore 'coercive.' It is arguable that, because the employer would be one of the bargaining parties, it could start the bargaining by offering present fringe benefits and go on from there, and that the propaganda is a threat that it will 'start from scratch,' meaning that it will, at the beginning, offer no fringe benefits at all—a matter that it can control. Applying section 8(c), we think that it protects these statements. They are predictions of possibilities or probabilities, not direct statements of what will happen, as was the case in [N.L.R.B. v.] Marsh Supermarkets [Inc., 7 Cir.1963, 327 F.2d 109], supra. See N. L. R. B. v. Mallory Plastics Co., 7 Cir., 1966, 355 F.2d 509; J. S. Dillon & Sons Stores Co., Inc. v. N. L. R. B., 10 Cir., 1964, 338 F.2d 395. The question is not free from doubt, but we believe that, because free speech is involved, both we and the Board should heed the Supreme Court's dictum, regarding section 8(c), in Linn v. United Plant Guard Workers, 1966, 383 U.S. 53, 62, 86 S. Ct. 657, 663, 15 L.Ed.2d 582:

> '* * * [C]ases involving speech are to be considered "against the background of profound * * * commitment to the principle that debate * * * should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." '

"As the court said in Southwire Co., [v. N. L. R. B., 5 Cir. 1967] supra, 383 F.2d [235] at 241:

> 'The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available. It is an adversary proceeding and hardly impartial * * *.'

"The mere fact that campaign propaganda may induce fear—and be intended to produce fear—does not deprive it of the protection of section 8(c). That is often the nature of campaign propaganda." [Footnote omitted]

See also: N. L. R. B. v. Herman Wilson Lumber Co., 355 F.2d 426 (8th Cir. 1966); Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128 (5th Cir.1964); N. L. R. B. v. Laars Engineers, Inc., 332 F.2d 664 (9th Cir.1964), cert. den. 379 U.S. 930, 85 S.Ct. 325, 13 L.Ed.2d 342, (1964).

In this Circuit we have upheld the right of free speech in a Union organizational campaign and stated that its exercise should not be narrowly restricted. N. L. R. B. v. Uniform Rental Serv., 398 F.2d 812 (6th Cir. 1968); N. L. R. B. v. Hobart Bros. Co., 372 F.2d 203 (6th Cir. 1967; Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir.1965); Union Carbide Corp. v. N. L. R. B., 310 F. 2d 844 (6th Cir.1962).

In Trent Tube Co., Subsidiary of Crucible Steel Co., 147 N.L.R.B. 538, 540 (1964), the Board in overruling the Regional Director's conclusion that an employer's letter which stated "bargaining starts from scratch" was coercive considered "not only the contents therein but their timing, the opportunity for petitioner to respond, and its actual responses thereto."

In the present case the Regional Director, in reaching his conclusion, stated that "* * * Employer's letters to its employees, taken as a whole, interfered with the employee's freedom of choice and, hence, with the conduct of the election."

The Regional Director did not follow the admonition of the Board in *Trent*

*Tube Co.,* supra, to take into account the timing, the opportunity of the Union to respond and its responses.

■ The Union had five weeks time to make a response. As previously pointed out, the Union made vigorous responses with statements that constituted misrepresentations of material facts. The United States Government and the N. L. R. B. do not guarantee employees that the collective bargaining process starts from "where you presently are in wages, insurance, pensions, profit sharing and all other conditions of employment" and "that there is only one way to go and that is up." Nor did the Board give its word to that effect. Nor did the Government guarantee "that you will lose no benefits except those you wish to change."

■ In our opinion the Board erred in considering the Company's campaign statements in isolation from those of the Union. The statements made by both should be considered by the Board after which a reasoned determination could be made as to whether either interfered with the employee's freedom of choice.

■ The right of free speech guaranteed by Section 8(c) of the Act applies to employers and labor unions alike. There is no basis for adopting a narrow restrictive rule for one party and a liberal one for the other.

The misrepresentations made by the Union did not prejudice the Company in the first election as the Union lost. But they were repeated in part in the second election which the Union won.

In our judgment, the minutes of the factory Suggestion and Complaint Committee do not support the Board's finding that the Company promised benefits to the employees if they rejected the Union.

■ Considering the record as a whole the findings of the Board of Sec-

tion 8(a) (5) and (1) violations are not supported by substantial evidence.

The first election held on July 15, 1964, was a valid election. The Board erred in setting it aside. The second election conducted within one year of the first election was invalid. The certification of the Union as collective bargaining representative made by the Regional Director was likewise invalid. The Company was under no duty to recognize or bargain with the Union. N. L. R. B. v. Blades Mfg. Co., 344 F.2d 998, 1004 (8th Cir.1965).

In view of this disposition of the first election, it is unnecessary to determine other questions raised concerning the second election.

### Job Leaders

■ The remaining issue in the case is the propriety of the Board's action in ruling that about sixty of the Company's hourly-paid employees taken from a large variety of job classifications with varying job duties were job leaders, and should be excluded from the bargaining unit as supervisors. The indiscriminate disenfranchisement of such a large number of employees is a serious matter which, in our judgment, required more consideration than was given to it in this case.

It should be observed that in all five prior representation cases the so-called job leaders were not treated as supervisors and were included in the bargaining units. The Company did not classify the job leaders as supervisors [4], and made no request for their exclusion. The Union contended that the job leaders were not supervisors and should be included in the Unit. It was the Regional Director who acted on his own initiative in his Initial Decision and Direction of Election in ordering their exclusion.

4. The Company had about 50 salaried supervisors for its 500 employees. If 60 additional hourly-paid employees are treated as supervisors, the Company would have about one supervisor for every five employees.

The Regional Director held:

"While the Employer takes no specific position as to job leaders, the Petitioner contends that job leaders are not supervisors and should be included in the unit. The record shows that the duties of job leaders in each department are to layout and plan jobs assigned to them and to direct the work of other employees in the accomplishment of these jobs. If, in their judgment, an employee can be more effectively used on another assignment, then they will reassign him to that job. The job leaders are paid a premium above their basic hourly rate for their leader responsibility. While they do not have authority to hire, fire, promote or discipline employees or to effectively recommend the same, I find, in view of the above and the record as a whole, that the *job leaders exercise independent judgment* in responsibly directing the work of other employees. They are, therefore, supervisors as defined in the Act. Accordingly, I shall exclude the job leaders from the unit."

The Company had left to the Board the determination of the appropriate unit but this did not include any concession with respect to the job leaders. On the contrary, the Company strenuously objected to the exclusion of the job leaders throughout the proceedings and sought a further hearing to offer additional evidence as to the job duties of the employees excluded but its requests were denied.

The only evidence on the subject was the testimony of James M. Schaefer, Director of Personnel. None of the employees who were affected by the ruling were called to testify. Schaefer testified on direct examination as follows:

"Q. What is a job leader?

A. A job leader is an individual who is primarily responsible for a group of employees in normally lesser classifications.

He is responsible for the direction of their work activities. He will primarily do planning of the job as it is to be accomplished and he will be responsible for the assignment of work to the specific individuals.

Q. Does he have the right to hire and fire or effectively recommend the hiring and firing of other employees?

A. No. This is not a part of his responsibility.

Q. Is he responsible or does he have the right to raise or lower compensation or effectively recommend the raising or lowering of the compensation?

A. This is not a part of his job duty.

Q. Does he have the right to discipline?

A. No.

Q. By docking or any other method of discipline of the other employees?

A. No. He is a job leader responsible for the assignment of the work, the direction of the individual's activity."

On cross-examination he testified:

"A His primary responsibility is the layout and planning of the particular job or set of jobs that have been assigned (241) to him.

Included in this will be a responsibility of directing the work efforts of the number of lesser rated individuals in the accomplishment of his particular tasks.

Q Does he spend a hundred percent of his time directing the work of others?

A No.

Q He participates in doing this work himself also?

A Yes. He can and he will.

Q In short, he would direct the men; he would also participate with the men doing the particular job that was under his direction?

A Yes, this could be a part of his method of operation.

Q What percentage of his time roughly would he spend in direction as distinguished from actual physical participation in the work?

A I don't think there is any general answer that could be given to that.

It would vary considerably with the nature of the job and the individuals involved.

Q I can understand that.

Can you make an overall estimate of this?

A Honestly no. Nothing that would fit the job leaders. They are all over the lot."

"* * *.

"Q Do the men who take their directions from the job (243) leaders regard them as their supervisors?

A They should not.

Q Does this job leader have any authority to change the work assignments of the individual, can he take a man from one job and put him on another job?

A If this is a part of the jobs to which the leader is assigned and its his judgment that this individual can be more effectively used in the completion of the jobs on another assignment he will do just this, yes.

Q In the event that an employee requires time off for any reason, to whom would he go?

A The supervisor.

Q He would not go to the job leader?

A He may discuss it with him but he would not get any official or formal answer from the job leader.

Q The job leader has no authority to tell a man to take time off he can't.

A No authority whatsoever.

Q Does the job leader recommend transfer to a foreman if he is dissatisfied with a man?

A This is not a part of his responsibility.

Q Does he do so on occasion?

A. Not that I know of."

In our judgment this testimony was not sufficient to justify the mass exclusion of the hourly-paid employees from the voting unit. Nor does it demonstrate that they share the powers of management. When motion was made to take additional evidence on the subject it should have been granted.

In NLRB v. Southern Bleachery & Print Works, Inc., 257 F.2d 235 (4th Cir.1958), cert. denied 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959), the Court said:

"* * * It is equally clear, however, that the employer cannot make a supervisor out of a rank and file employee simply by giving him the title and theoretical power to perform one or more of the enumerated supervisory functions. The important thing is the possession and exercise of actual supervisory duties and authority and not the formal title. It is a question of fact in every case as to whether the individual is merely a superior workman or lead man who exercises the control of a skilled worker over less capable employees, or is a supervisor who shares the power of management. * * *"

To the same effect is NLRB v. Griggs Equip., Inc., 307 F.2d 275 (5th Cir. 1962).

In Precision Fabricators, Inc. v. NLRB, 204 F.2d 567, 569 (2d Cir.1953), the Court, in referring to a leadman, said:

"We will assume that he was the room 'boss' or 'leadman,' but the discretion given him appears to be 'routine' in the natural sense of that word. As Judge Magruder said in National Labor Relations Board v. Quincy Steel Cast Co., 1 Cir., 200 F.2d 293, 296: 'The legislative history of § 2(11) tends to support the Board's view that certain employees with minor supervisory duties, such as straw bosses and leadmen, were not intended to be excluded from the coverage of the Act.'" [Footnote omitted.]

The power of the Board under Section 9(b) of the Act to determine appropriate bargaining units is broader than its power to determine who is a supervisor. The determination of a bargaining unit is binding on an appellate court unless the Board has acted arbitrarily or violated the statute, May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Metropolitan Life Insurance Co. v. N. L. R. B., 330 F.2d 62 (6th Cir. 1964) vacated on other grounds, 380 U. S. 525, 85 S.Ct. 1326, 14 L.Ed.2d 265. (1965); N. L. R. B. v. Swift & Co., 292 F.2d 561 (1st Cir.1961); N. L. R. B. v. Esquire, Inc., 222 F.2d 253 (7th Cir.1955).

Whether or not an employee is a supervisor is a question of fact. The determination of the issue by the Board is conclusive only when supported by substantial evidence. Section 10(e) of the Act, 29 U.S.C. § 160(e); Peoples Service Drug Stores, Inc. v. N. L. R. B., 375 F.2d 551, 554 (6th Cir.1967).

We are of the view that adequate consideration was not given to this issue by the Board. As we previously pointed out, about sixty (60) of the job leaders of different classifications were all taken out of the voting unit without calling a single one of them as a witness. We are not suggesting that all of them should have been called to testify but at least representatives of some of the various classifications should have been heard. When the Company moved to take additional testimony, this motion should have been granted particularly since this had not been an issue between the Company and the Union, both of whom wanted the leaders included in the unit, but was between the Board and the disqualified employees who were not heard or represented.

The job leaders were disqualified at the representation hearing. At that time the specific duties and functions of the job leaders were not developed in much detail either by the Union or the Company no doubt because it was not in issue between them. The Company had no reason to believe at the time of the hearing that the job leaders would be excluded on the initiative of the Board because they had always been included in prior representation cases.

Just to conclude, as did the Regional Director, that all these job leaders of different classifications exercise independent judgment in responsibly directing the work of other employees was not sufficient to qualify them as supervisors. The particulars in which independent judgment was exercised should be articulated.

In another representation hearing both the Company and the Union will have the opportunity to offer additional evidence on this subject from which a better reasoned determination may be made.

The order of the Board is denied enforcement in each case.