NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TAMPER, INC., Respondent.

No. 74-1331.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1974.

Decided July 24, 1975.

John G. Elligers, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., on brief) for petitioner.

J. Frank Ogletree, Jr., Atlanta, Ga. (Thompson, Ogletree & Deakins, Atlanta, Ga., on brief) for respondent.

Before BOREMAN, Senior Circuit Judge, and BUTZNER and FIELD, Circuit Judges.

BOREMAN, Senior Circuit Judge:

This proceeding was brought by the National Labor Relations Board (herein Board) pursuant to Section 10(e) of the National Labor Relations Act,[1] seeking enforcement of its order based upon findings of numerous violations of the Act by respondent, Tamper, Incorporated (herein Tamper or Company). The Board's decision and order, Chairman Miller dissenting in part, which adopted the decision of the Administrative Law Judge, are reported at 207 N.L.R.B. 907 (Dec. 14, 1973).

The Board found Tamper guilty of the following violations: (1) coercively interrogating employees concerning organizational activities; (2) conveying an impression to employees of surveillance by the Company of organizational activities; (3) threatening to withhold general wage adjustments in order to influence a Board ordered election; (4) threatening to bargain "from scratch" if the Union prevailed in the election; (5) interrogating employees subpoenaed by the Board about charges filed by the General Coun-

sel with the Board; (6) reprimanding an employee on May 8, and on June 6, 1972, for organizational activities; (7) transferring an employee because of organizational activities; and (8) discharging an employee on July 5, 1972, for organizational activities. Because of the complexity of the evidence and the importance of several of the issues raised we find it necessary to set forth our conclusions in detail.

In early 1972, Local 509 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein Union) began an organizational campaign at Tamper's Columbia, South Carolina, plant. The Board scheduled a representation election for July 12, 1972, but, as a result of several unfair labor practice charges filed against Tamper, the election was postponed until October 10, 1972. A hearing on the unfair labor practice charges was scheduled for October 11, the day after the election. The Union lost the election and additional unfair labor practice charges were filed. The Administrative Law Judge who heard the matter found Tamper guilty of the numerous violations previously set forth herein and a new election was ordered. The Board summarily adopted the Administrative Law Judge's decision and order and now petitions this court for enforcement.

The General Counsel alleged and the Board found that the Company violated Section 8(a)(1) of the Act[2] by coercively interrogating employees about protected organizational activities. The credited evidence shows that on June 19, 1972, Clarence Adkins, a supervisor, approached Jimmy Patterson, an employee, and asked him what he thought about the Union and how he was going to vote. Upon receiving an evasive answer, Adkins advised Patterson that if he were smart he would not vote for the Union. About a week later Adkins again approached Patterson, who had just been talking with Clarence Berry, a Union or-

1. 29 U.S.C. § 160(e).

2. 29 U.S.C. § 158(a)(1).

ganizer, and advised him not to talk with Berry since Berry might try to influence his decision about voting on unionization. Although the other alleged incidents of coercive interrogation of employees by supervisors [3] are less dramatic, they cannot be viewed in isolation. In view of all the evidence, we are of the opinion that there is substantial evidentiary support for the Board's finding that the Company had engaged in coercive interrogation of those employees and conclude that its order should be enforced in that respect. *See Corrie Corporation v. N.L.R.B.*, 375 F.2d 149 (4 Cir. 1967).

On May 1, 1972, Clarence Adkins, a supervisor, approached Robert F. Bone, an employee, to discuss some personal matters. During this conversation Bone mentioned that he was going to a Union meeting the next day. Adkins then told Bone that he knew "what was going on" and that he (Adkins) "knew how many people were attending those meetings and what was being done." Adkins admitted at the hearing that he was opposed to the Union and that he tried to influence others not to support the Union. We believe the statements of Adkins were intended to convey an impression that organizational activities were under surveillance by the Company. The obvious purpose of such a statement was to persuade employees that participation in organizational activities could jeopardize their employment. The evidence fully supports the Board's conclusion that the Company tried to convey an impression of surveillance and the Board's order will be enforced in that respect. *See Filler Products, Inc. v. N.L. R.B.*, 376 F.2d 369, 373–375 (4 Cir. 1967).

■ We also find substantial evidentiary support for the Board's conclusion that the Company threatened to withhold the biannual wage adjustments with intent to influence those voting in the election. Although the Company did not actually alter its wage adjustment

policy during the campaign and granted pay increases to 136 of its 140 employees, Gordon L. Beatty, Tamper's local manufacturing manager, stated at an employee meeting that the biannual wage adjustment program was being considered but added "we can't do anything right now until this mess is over with but just as soon as it [is] over with, [we] can issue the new classifications." Although Beatty's remark considered alone might not be sufficient to constitute a threat to withhold benefits in order to influence the election the statement when considered in the light of the other coercive measures properly attributed to the Company takes on an ominous character. We are satisfied that the Board's finding that this was a violation of the Act is supported by substantial evidence. *See N.L.R.B. v. Lexington Chair Co.*, 361 F.2d 283, 290 (4 Cir. 1966).

■ We next turn to the Board's finding that the Company threatened to bargain "from scratch" if the Union prevailed in the election. The alleged threat consisted of a poster which quoted a portion of the Board's opinion in *Midwestern Instruments, Inc.*, 133 N.L.R.B. 1132, 1138. That poster read as follows:

REGARDLESS OF WHAT THE UNION SAYS—THIS IS THE LAW
. . . "There Is, Of Course, No Obligation On The Part Of An Employer to Contract To Continue All Existing Benefits, Nor Is It An Unfair Labor Practice To Offer Reduced Benefits
. . ."

(Midwestern Instruments, Inc., 133 N.L.R.B. 1132)

Chairman Miller dissented from the Board's finding that display of this poster constituted an unfair labor practice. We note, as did Chairman Miller in dissent, that the poster was treated as a *per se* violation since no reference was made to any other incident or statement which might have given the language of the poster some meaning other than that which its words would ordinarily convey.

---

3. The other incidents of coercive interrogation were supervisor Bundrick's interrogation of employee Mason in March, 1972, and manu- facturing manager Beatty's interrogation of employee Martin in June, 1972.

To constitute a violation, a statement of intent to bargain from scratch must evidence an intent to deal more harshly in negotiating with a union than was done with individual employees so as to create the impression that a union victory would cause a reduction of existing benefits. *Textron, Inc.*, 199 N.L.R.B. 131 (1972); *see also Automation and Measurement Division, The Bendix Corp. v. N.L.R.B.*, 400 F.2d 141 (6 Cir. 1968). The poster alone does not convey that message and its display was not a *per se* violation. *See N.L.R.B. v. Aerovox Corp.*, 435 F.2d 1208 (4 Cir. 1970); *Wellington Mill Division, West Point Manufacturing Co. v. N.L.R.B.*, 330 F.2d 579 (4 Cir. 1963). Since there is no finding that surrounding circumstances gave a different character to the language of the poster which would support the Section 8(a)(1) citation, we decline to grant enforcement. *See N.L.R.B. v. Holly Farms Poultry Industries, Inc.*, 470 F.2d 983 (4 Cir. 1972). There is absolutely no evidence in the record that the Company threatened to bargain more harshly with the Union than it had with individual employees; enforcement of the Board's order as it relates to that charge is denied.

■ On October 9 and 10, 1972, an attorney for Tamper conducted interviews with employees in preparation for the unfair labor practice hearing which was scheduled for October 11. The seven persons who had been subpoenaed by the Board were asked by the attorney whether they had given a statement to the Board and were then questioned about any information which they had relating to the charges set forth in the complaint then pending before the Board. The Administrative Law Judge ruled, and the Board agreed, Chairman Miller dissenting, that there is "no meaningful distinction between interrogation concerning the contents of a statement submitted to the Board and interrogation concerning employee knowledge of complaint allegations, coupled with an inquiry as to whether a statement was submitted." Hence, the Board held that the interrogations constituted a Section 8(a)(1) violation. We disagree.

Assuming that interrogation concerning the contents of a statement made to the Board would, under these circumstances, be a violation of the Act,[4] we do not believe the conduct and procedures pursued by the Company's attorney can be equated with such an interrogation. Further, we believe that the Company was warranted under those circumstances in seeking the voluntary cooperation of employees in preparing a defense to the complaint filed with the Board. First, we note that the employees who were interviewed were those who had been subpoenaed to appear before the Administrative Law Judge to testify at the unfair labor practice hearing; those employees obviously were believed to have pertinent information about the complaint against which the Company was preparing to defend itself. The questions which were asked were drawn from the statement of charges filed with the Board; the interview was directed only to matters within the bounds of legitimate interest of the Company and did not digress into sensitive areas of organizational activity. This was not a situation where the employer engaged in indiscriminate interviews with employees in a manner which might deter other employees from making statements to the Board. *See Texas Industries, Inc. v. N.L.R.B.*, 336 F.2d 128 (5 Cir. 1964). The procedure followed in this instance precluded any inference by the employees that the Company was seeking the information to suppress protected organizational activity.

It is essential that a balance be struck between the employees' right to speak confidentially with Board investigators and the Company's right to prepare a defense to unfair labor practice charges. We believe it was proper for the Company to request interviews with the subpoenaed employees and to seek from them information about the complaint filed with the Board. *See Joy Silk Mills,*

---

4. *See Robertshaw Controls Co., Lux Time Division v. N.L.R.B.*, 483 F.2d 762 (4 Cir. 1973).

*Inc. v. N.L.R.B.,* 185 F.2d 732 (D.C.Cir. 1950). We find the following observations about the effort by another Government agency to employ similar "trial by ambush" tactics pertinent here:

> All defendant wants to do is to talk to persons having knowledge of the vague charges; to depose them if necessary; to use their testimony if helpful to defendant and to prepare to rebut it if hurtful. Fair play, a fair trial, and the requirements of due process of law demand that defendant be permitted to find out in advance of trial what the case is all about.

*Equal Employment Opportunity Commission v. Los Alamos Constructors, Inc.,* 382 F.Supp. 1373 (D.N.M.1974).

We do, however, conclude that those interviews were improper and constituted an unfair labor practice for the alternative reason offered by the Board. Where the interview centers on charges filed against the Company it is essential that precautions be taken to preclude any suggestion of coercion against those whom the General Counsel intends to call as witnesses. In this instance the Company's attorney did not advise the employees that they could decline to answer his questions; nor did he assure the employees that their answers would not lead to reprisals. When the attorney advised some of the employees that he had a "right" to ask them questions, his statement also appears to have conveyed to at least some of those interviewed the impression that they had a duty to respond.[5] Under these circumstances we are not convinced that the interviews were voluntary. Since there is a strong likelihood that the employees felt coerced into answering the questions posed by the Company's attorney and their responses may have been colored by the absence of an assurance against reprisals we believe the finding of a Section 8(a)(1) violation is supported on this basis. *N.L.R.B. v. Buddy Schoellkopf Products, Inc.,* 410 F.2d 82, 88 (5 Cir. 1969). That portion of the Board's order will be enforced.

Finally we turn to the alleged unfair labor practices involving Clarence Berry. Berry was a pro-union activist who participated in the organizational campaign as early as May 1, 1972. Prior to engaging in organizational activities, Berry had compiled an excellent work record with the Company and had advanced rapidly to the position of inspector. On May 8, 1972, during working hours, a couple to whom Berry had rented a mobile home came to the Tamper plant to speak with Berry. Berry interrupted the performance of his duties as an inspector and went to the parking lot where he conducted a ten to fifteen minute discussion with the couple. When Berry returned to work he was informed that he had violated a Company rule by leaving the plant and received a warning that further violation of Company rules would result in termination of his employment; he was also suspended without pay for the duration of the work shift that day. The General Counsel, apparently believing the warning and suspension were proper, did not charge this as an unfair labor practice in the complaint filed with the Board.[6] The Administrative Law Judge, acting *sua sponte,* held the Company's actions were motivated by anti-union considerations and therefore constituted an unfair labor practice. The Board summarily adopted this finding, Chairman Miller dissenting.

■ Employees who engage in illegal acts against their employer cannot hide behind their participation in protected organizational activities to shield

---

5. We do not question the good faith of the Company's attorney in conducting these interviews. There is no evidence that he actually intended to make those whom he interviewed feel compelled to answer his questions. However, we believe greater protection of employee rights was necessary and that evidence that the interviews were not truly voluntary cannot be ignored.

6. There is some evidence that the General Counsel specifically refused to prosecute this alleged violation. In dissenting to the finding of the Board on this issue, Chairman Miller noted that the General Counsel told the Administrative Law Judge that the unauthorized exit from the plant was "admitted by Berry and [is] not claimed to prove a violation of the Act."

them against disciplinary action. *N.R. L.B. v. Commonwealth Foods, Inc.,* 506 F.2d 1065 (4 Cir. 1974). Similarly, one's status as a union sympathizer and organizer cannot shield him from punishment for violation of reasonable rules governing his work. Berry violated a Company rule by leaving his work area. It was not a *per se* violation of the Act by the Company to reprimand him for doing so. If the Company's action violated the Act it must be because the reprimand was motivated by Berry's participation in protected organizational activities rather than because of his violation of the rule.

Little attention was given to this occurrence at the hearing before the Administrative Law Judge. The General Counsel offered the evidence concerning this incident as background material and declined to cite the suspension and reprimand as separate unfair labor practices.[7] It appears that the Company considered this evidence inconsequential since no allegation of misconduct was based upon it[8] and the Company, therefore, did not undertake to present evidence justifying its actions.[9] The complaint was not amended to charge this incident as a violation of the Act and the parties were not advised by the Administrative Law Judge that he would try this as a separate offense.[10]

Our examination of the record reveals that the evidence on this issue was inconclusive.[11] The parties did not litigate

---

**7.** The observations of Chairman Miller, in dissent, forcefully make this point:

> [T]here was no allegation in the complaint of any illegality concerning these reprimands. In light of what appears to be an affirmative refusal on the part of General Counsel to allege this as a violation and the very real possibility that Respondent did not therefore present a full defense to this issue, I would not find this to be a violation of Section 8(a)(3). . . .

(footnote omitted.)

**8.** The Company stated during oral argument to this court that it did not object to the introduction of this evidence at the hearing because it was submitted only as background material.

**9.** The Company argues on appeal that its actions in this instance were fully justified. The General Counsel was satisfied that the Company's actions were not in violation of the Act since he did not allege them as violations. Since the General Counsel did not charge this incident as a separate violation of the Act, he must have had some evidence before him which he believed vindicated the Company's actions. Since that issue was not fully litigated, the record does not reveal what that evidence was.

**10.** The Eighth Circuit was confronted with a similar situation in *Montgomery Ward & Co. v. N.L.R.B.,* 385 F.2d 760 (1967). Judge Van Oosterhout, writing for the court, noted the inherent unfairness of predicating a finding of an uncharged violation upon evidence presented in support of a charged violation. First, he noted that such a procedure could result in the presentation of insufficient evidence to decide the issue. As the following passage from his opinion indicates, at page 763, that is not the only vice of such a procedure:

> Additionally the Examiner, upheld by the Board, determined Wards to be guilty of a number of § 8(a)(1) violations not charged in the complaint. The complaint charged specific violations and contained no catchall provision. The Board concedes that it attempted to prove additional violations not charged in the complaint and that no attempt was made to amend the complaint. The Administrative Procedure Act, 5 U.S. C.A. § 1004, and the Board's own rule, 29 C.F.R. § 102.15, require that the complaint apprise the parties proceeded against of the violations charged. "Evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice." "It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing." *Engineers & Fabricators, Inc. v. N.L.R.B.,* 5 Cir., 376 F.2d 482, 485. *See N.L.R.B. v. Majestic Weaving Co.,* 2 Cir., 355 F.2d 854, 861; *N.L.R.B. v. Threads, Inc.,* 4 Cir., 308 F.2d 1, 9–10.

**11.** One must bear in mind that this is a petition by the Board seeking enforcement of its order. The burden is upon the Board to demonstrate that there is substantial evidence in the record to support the findings underlying its order. Because the only evidence with respect to this issue was that which the Administrative Law Judge gleaned from the background material presented by the General Counsel, there is virtually no evidence directly bearing upon the motive for suspending and reprimanding Berry and no evidence that such disciplinary measures were not customarily followed in similar situations involving other

this incident because it was not an issue until the Administrative Law Judge released his report.[12] Whether the Company could have shown that its actions were usual under the circumstances had it been advised that the matter would be tried is not shown on the record.[13] We believe it is an intolerable miscarriage of justice to attribute improper motives to the company officials without affording them an opportunity to defend themselves. This form of trial without notice should not be condoned. The finding of a violation of the Act as a result of the warning and the suspension stemming from the May 8 incident and the award of one-half of a day's pay are not warranted and enforcement of the order of the Board in this respect will be denied.

 The evidence with respect to the transfer of Berry to a remote work station and the imposition of additional duties in mid-May is conflicting. The Administrative Law Judge concluded that the transfer was made to isolate Berry, thereby reducing his contact with other employees and his influence as a Union organizer. The Board adopted this finding and the Judge's conclusion that it constituted a Section 8(a)(1) violation. Since there is substantial evidence to support this finding that part of the Board's order will be enforced.

The Board adopted the Administrative Law Judge's *sua sponte* conclusion that the transfer of Berry and imposition of additional duties also constituted a Section 8(a)(3) violation since there was a change in "terms or conditions of employment," although an 8(a)(3) was not alleged in the complaint.[14] No amendment of the complaint was made and the General Counsel at no time prior to the issuance of the Administrative Law Judge's opinion asserted that this was a violation of Section 8(a)(3).

The Company has not asserted a lack of due process with respect to the finding of this Section 8(a)(3) violation. Accordingly, we do not decide whether the failure to amend the complaint or to give notice that the issue would be tried makes the finding of that violation subject to the same infirmity as was the finding of an unfair labor practice with respect to the May 8 incident. However, there is another defect with respect to that 8(a)(3) finding. The Administrative Law Judge became, in effect, a litigant with respect to the issue whether the transfer constituted a Section 8(a)(3) violation, and, in so doing, failed to act with the impartiality necessary to the conduct of his office.[15] While we do not doubt

personnel not engaged in organizational activities. We deny enforcement of an order such as this which stands on such an incomplete foundation.

12. The circumstances confronting us in this respect are strikingly similar to those which confronted the Tenth Circuit in *J. C. Penney Co. v. N.L.R.B.*, 384 F.2d 479 (1967). We find instructive the following passages from the court's opinion at page 483:

From these facts we think it is clear the Board made a finding which was neither charged in the complaint nor litigated at the hearing. By Regional Counsel's own statement, it is manifest that the employer was never put on notice that Cox's purported statement standing alone was in issue, and that Miller's testimony and affidavit were introduced for the sole purpose of corroborating other evidence regarding the purpose of the wage increases. . . . Failure to clearly define the issues and advise an employer charged with a violation of the law of

the specific complaint he must meet and provide a full hearing upon the issue presented is, of course, to deny procedural due process of law. *N.L.R.B. v. Bradley Washfountain Co.*, 7 Cir., 192 F.2d 144. We cannot enforce a finding based on a charge not in the complaint where the record, as does this one, clearly discloses that the issue has not been litigated. *N.L.R.B. v. H. E. Fletcher Co.*, 1 Cir., 298 F.2d 594. Thus we do not reach the question whether the statement itself violated 8(a)(1).

*Accord, Boyle's Famous Corned Beef Co. v. N.L.R.B.*, 400 F.2d 154, 161–165 (8 Cir. 1968).

13. *See* notes 7 and 9 *supra*.

14. "The division of one violation of the Act into many violations should not be encouraged." *Korn Industries, Inc. v. N.L.R.B.*, 389 F.2d 117, 123 (4 Cir. 1967).

15. It would appear that the Administrative Law Judge has failed to heed our repeated warnings that he must act as a disinterested

that the Administrative Law Judge in the exercise of his discretion may call attention to an uncharged violation or decide an uncharged violation *which has been fully litigated by the parties,*[16] we do not believe he should undertake to decide an issue which he alone has injected into the hearing—especially where, as here, the parties were never advised to litigate the issue. Once the Administrative Law Judge undertook the General Counsel's prosecutorial function by ferreting out evidence of uncharged violations and building a case against the defendant-employer he overstepped the permissible scope of his duties. We conclude that his actions in this respect were so inherently prejudicial that this court, in the interest of its own integrity, must not condone the finding of the Section 8(a)(3) violation. Therefore, we decline to enforce this finding of a Section 8(a)(3) violation.

On June 6, 1972, Berry was asked by his supervisor to report to Beatty's office. Beatty gave the supervisor a written warning to be read to Berry. That warning alleged that Berry had made repeated mistakes and informed him that a continuation of such errors could not be tolerated. While it was shown that Berry had made at least some of the alleged mistakes the surrounding circumstances strongly suggest that the warning was not motivated by those errors. It appears that it was not unusual for a new inspector in that work area to make mistakes and the normal procedure was for the supervisor to inform the inspector when the error was made and instruct the inspector on how

to avoid the error in the future rather than to cumulate the errors and present them in the form of a written warning. The Administrative Law Judge assigned the following facts in support of his conclusion that the warning was motivated by anti-union considerations:

(1) the fact that Berry, being new on the job and being assigned the second shift when quality control supervisor Dowd was not on duty, asked Dowd for permission to call the latter at home in event of a question, and was denied; (2) the fact that Dowd asked Broad, a pro-Company employee, to investigate Berry's work, and submit a written report to Dowd; (3) the fact that Berry, with Respondent's knowledge thereof, appeared at the representation hearing on May 31, on behalf of the Union; and (4) the fact that Respondent, contrary to customary practice, had not brought the alleged mistakes to Berry's attention when they occurred. [Footnotes omitted.]

We, therefore, agree that the issuance of a written warning to Berry on June 6, 1972, constituted a violation of Sections 8(a)(1) and (3) of the Act and grant enforcement of the Board's order in that respect.

Berry was discharged on July 5, 1972, allegedly because he committed numerous mistakes in his new position as a final inspector. The Board's conclusion that he was transferred to final inspection because the Company thought that he would likely make numerous mistakes is supported by the evidence. This was a demanding job and a new man was not

---

fact finder and not as a prosecutor. *See Stone & Webster Engineering Corp. v. N.L.R.B.,* 510 F.2d 966 (4 Cir. 1975); *Tele-Trip Co. v. N.L. R.B.,* 340 F.2d 575, 581 (4 Cir. 1965). *See also* Code of Judicial Conduct, Canon 2.

**16.** *See American Boiler Manufacturers Assn. v. N.L.R.B.,* 366 F.2d 815, 821 (8 Cir. 1966). Since the General Counsel had offered evidence of this incident in support of the alleged Section 8(a)(1) violation the facts surrounding the transfer were presented. However, when the Administrative Law Judge undertakes to

increase the number of violations arising from a single incident without notification to the parties there is a danger that evidence which was not relevant to the charged violation but which is relevant to the uncharged violation might not be presented. As noted in the text, since the Company has not alleged a due process defect with respect to this violation, we assume that all evidence relevant to the uncharged Section 8(a)(3) violation was presented. *See* note 10 *supra.*

likely to master it quickly. The Board's inference that these anticipated errors were seized upon as a pretext to discharge Berry also finds support in the evidence. The event which precipitated the discharge of Berry was his failure to send certain rods out for chrome-plating and it is clear that this incident was seized upon as an excuse to fire him. We believe the reasons assigned by the Administrative Law Judge adequately demonstrate that the reasons assigned by the Company for the discharge were pretextual and that the discharge was in reality because of Berry's organizational activity. There is some evidence that this incident was deliberately contrived to cause the mistake. Specifically we note that manufacturing manager Beatty testified that he had been gathering information about the piston rods before Berry made the mistake because "we knew we were going to be here." Unless the decision to discharge Berry was made prior to his commission of the error it is difficult to understand how Beatty knew he would need evidence to support Berry's discharge; it is especially a ground for suspicion that evidence about the rods was being gathered by Beatty the day before the mistake was made. We note further that the decision to discharge Berry was made without hearing his side of the incident and this suggests that the discharge may have been prompted by some factor other than the error in routing the rods. The Board properly accepted the Administrative Law Judge's conclusion that the discharge of Berry violated Sections 8(a)(1) and (3) of the Act.

The Board's petition for enforcement of its order is granted in part and denied in part as hereinbefore determined and as set forth fully herein.