**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHLAND CORK COMPANY, Respondent.**

No. 9593.

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1964.

Decided March 1, 1965.

Warren M. Davison, Attorney, National Labor Relations Bd. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Provost, Asst. Gen. Counsel, and Paula Omansky, Atty. National Labor Relations Bd. on brief), for petitioner.

George V. Gardner, Washington, D. C., (Frederick F. Holroyd, Charleston, W. Va., and Gardner, Gandal & Holroyd, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge:

The National Labor Relations Board petitions for enforcement of its order passed on April 17, 1964, requiring Southland Cork Company of Norfolk, Virginia, to make whole certain of its employees for earnings lost by them as a result of an unfair labor practice strike. It is therefore necessary to determine whether there is substantial evidence on the record as a whole to support the Board's findings that Southland engaged in unfair labor practices, and that this conduct was the cause of the strike.

The facts are fully set forth in the Board's decision and order, reported at 146 N.L.R.B. 119. For present purposes a brief summary will suffice.

Following an election, the Board, on September 7, 1962, certified the Construction & General Laborers' Local Union No. 7, International Hod Carriers, Building & Common Laborers' Union of America, AFL–CIO (Union) as representative of Southland's production and maintenance employees. Despite strong efforts on the part of the union in the seven-month period between certification and the onset of the strike on March 11, 1963, it succeeded in arranging only two bargaining sessions with the employer. In January, 1963, Raymond Murphy, the union's attorney and negotiator, expressed concern that, in light of the employer's tactics, and five months of the union's one year certification having passed, there was little reason to believe that the employer would cooperate in scheduling timely bargaining sessions or that it would be possible to complete negotiations and have a contract signed within the one-year period. In January, 1963, he called separate meetings of male and female employees at which he explained the situation. By unanimous votes he was authorized to call a strike if he felt it necessary.

Murphy, however, persisted in his efforts to bring about further bargaining sessions, but to no avail. On Wednesday, March 8, 1963, a number of persons

appeared at Southland's plant seeking employment in response to "help wanted" signs which it had posted the day before. They were permitted to fill out job applications on the working floor of the plant, in full view of the regular employees. They and others, who had filled out job applications in the office, were then escorted through the plant in small groups, openly and visibly to the employees. After being informed of these events, Murphy decided to call a strike for the following Monday, March 11, 1963. On that date the strike began.

The union filed unfair labor practice charges on April 8, 1963, and thereafter bargaining sessions were held on April 15, May 1, 2 and 22 and June 6 and 13.

From the inception of the strike, the plant continued to operate with strike replacements. Then on May 2, 1963, the union on behalf of the striking employees made an unconditional offer to return to work immediately. They were not at once restored to their jobs. However, over the next three or four months, Southland did gradually reinstate all the strikers who had offered and still desired to return to work.

The Board, agreeing with the Examiner, found that Southland had violated section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158 (a) (5) and (1) (1956), by failing to meet and confer with the union in good faith at reasonable times and intervals; by refusing to make and unduly delaying any good faith attempt to furnish the union pertinent financial information; by insisting on recognizing the union as the representative of only those unit employees who had been continuously employed by the company for 180 days (later reduced to 120 days); and by refusing at all times after July 19, 1963, to meet and bargain with the union because of the unresolved unfair labor practices charged in this case.

In addition, the Board, rejecting the contrary conclusion of its Trial Examiner, also found the posting of "help wanted" signs and touring of job applicants through the plant to be violations of section 8(a) (1) of the Act. Because it considered this illegal conduct to be the *immediate* cause of the strike, the Board held it to be an unfair labor practice strike. However, the Board also determined that this was in any event an unfair labor practice strike because it was caused by Southland's refusal to bargain in good faith. Accordingly, the Board further held Southland guilty of discrimination against the unfair labor practice strikers in violation of section 8(a) (3), and (1) of the Act since it did not immediately reinstate them upon their offer to return to work.

## I. REFUSAL TO BARGAIN IN GOOD FAITH— 8(a) (5) and (1)

### A. *Failure to Confer at Reasonable Times and Intervals.*

In this court the Board argues that the long delays between bargaining sessions and cancellation of scheduled meetings were due to the employer's dilatory tactics. The Examiner and the Board both rejected the employer's defense that delay in arranging bargaining sessions was brought about by its difficulties in retaining a bargaining representative, and further difficulties in thereafter securing his services as often as required.

Southland acknowledges that it was dilatory. It makes the novel contention, however, that the negotiation of a collective bargaining agreement is the union's function and not the company's business. The company's brief declares:

"The Board appears to overlook one obvious fact in cases of this nature: The Companies involved are not in business to negotiate Union contracts as is the Union. The demands on Respondent's time to operate its business were very great. Business was down. Profits were low. It could not therefore spend full time securing the services of a labor consultant. It had to do this when time was available from the

business. It would not help the employees or the Union if Respondent stopped running the business merely to negotiate, for soon there would be no jobs or dues. The Trial Examiner (supported by the Board) is punishing Respondent because its labor consultant was busy and not at home or in his office when the Union called."

In short, Southland claims that its failure to obtain the services of a negotiator readily available to confer with the union at reasonable times and intervals was excusable because of its preoccupation with normal business operations. Southland would have us rule that its conduct was therefore not an unfair labor practice.

We cannot accept this argument. The record shows that the union's repeated attempts to bargain were thwarted by the employer. On September 25, 1962, Damon Radford, the union's business representative, sent to H. Rives King, Southland's president, a copy of a proposed contract along with a letter expressing the union's willingness to meet on short notice and to negotiate "so that we may consummate an agreement at the earliest possible time." After acknowledging this letter on October 2 and after further exchange of correspondence, King sent a letter to the union on October 22, stating that because the company was operating below capacity, its "entire efforts should be devoted in attempting to alleviate our present position." For that reason, the company said, it could not agree to meet before Monday, November 26. Radford replied that:

"the essence of good faith collective bargaining is promptness in meeting for negotiations. Employees represented by us will not continue to work while our certification is caused to expire by delaying tactics. Respectfully request meeting on November 5."

King demurred, and the union, in the interest of "good will and co-operation," agreed to the November 26 date.

The first meeting was held on November 26. At the end of the second meeting, on December 12, Murphy asked that a date be set for another session. George Gardner, the company's attorney, indicated that because of his involvement in other matters he could not set a date at that time.

Thereafter, the union's attempts to arrange another meeting proved unsuccessful until after it had filed unfair labor practice charges on April 8, 1963. Six meetings were then held after the filing of unfair labor practice charges by the union, but then on July 19, 1963, the company altered its position: King, its vice president, informed Radford, the union representative, that "a meeting with you [the union] would serve no useful purpose until the charges filed with the National Labor Relations Board have been resolved."

There is thus ample support for the finding that the company failed to exercise that degree of diligence required to comply with its statutory duty to bargain in good faith. See Solo Cup Company v. N L R B, 332 F.2d 447, 448 (4th Cir. 1963); N L R B v. M. & M. Bakeries, Inc., 271 F.2d 602, 603 (1st Cir. 1959). Furthermore, Southland's defense fails to recognize that the Act imposes an affirmative duty of good faith bargaining on both the employer, 8(a) (5), and the union, 8(b) (3).

There is no merit in Southland's facile assertion that the "entire allegation of refusal to bargain stems from one simple fact: the Union did not get what it wanted from the Company."

B. *Refusal to Furnish Financial Information.*

At the first negotiating session, held on November 26, the employer's position was that it was unable to agree to a wage increase or to any greater monetary benefits because of the insufficiency of its earnings. The union accepted the company's offer to prove financial inability, and said that it would arrange to have the union's auditor go over the company's books.

At the second meeting, on December 12, the employer repeated that it did not have the money to grant wage increases. Union negotiator Murphy pointed out that, if the claim was made in good faith, the company should permit the union to examine its books to enable it to decide whether or not to drop the wage demands. The company, however, refused to permit such examination on the ground that it "was involved in a program in which it was seeking capital investment."

The company persisted in its refusal to allow inspection of its books until after the union filed unfair labor practice charges. Thereafter inspection was allowed.

The Board deemed the evidence sufficient to show that the refusal to furnish financial information constituted a lack of good faith bargaining, relying on the well settled rule that, when an employer claims financial inability to grant a demanded wage increase, he must, upon the union's request, furnish financial data to substantiate his claim. National Labor Relations Board v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956).

The employer now asserts that during the negotiations it resisted a wage increase not on the basis of financial inability but as a matter of sound business judgment. Therefore, it maintains, the Truitt rule is inapplicable.

It would be difficult to reconcile the shifting positions taken by the company. If it asserts inability to meet the union's demands and offers to establish the fact, it cannot avoid its duty to afford substantiation by then drawing a subtle distinction between inability to pay and refusal to pay as a matter of "sound business practice." Whatever basis there might be in other circumstances for such a distinction, we have no occasion to deal with it here, since the Trial Examiner's conclusion, adopted by the Board, was supported by substantial evidence that it was not until the union filed charges that the company took the position that it was not "pleading poverty."

C. *Attempts to Change the Bargaining Unit.*

■ Although the Board had certified the union as bargaining representative for *all* production and maintenance employees, the company admittedly insisted that the recognition clause be restricted to "permanent" employees, which it defined as those employed continuously for 180 and later 120 days. In attempting to change the unit for which the union was certified, Southland violated section 8(a) (5), since the Act required it to accord recognition to the union as representative of all employees in the unit. McQuay-Norris Mfg. Co., v. National Labor R. Board, 116 F.2d 748, 751 (7th Cir. 1940), cert. denied, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524 (1941).

Southland seeks to justify its conduct on the theory that the union also attempted to change the unit by seeking to represent union members only. The Trial Examiner, however, found that there was a lack of proof that the union had taken such a course of action. Moreover, even had the union made such an attempt, and thereby subjected itself to a charge of unfair labor practice, its conduct would be no defense to the charge against Southland.

D. *Refusal to Meet during Pendency of Charges.*

■ It is unchallenged that after June 13, 1963, Southland flatly refused to meet with the union because of the pending unfair labor practice charges. The filing of charges with the Board does not relieve the parties of the duty to bargain in good faith. Thus Southland's conduct was a clear violation of the Act. Solo Cup Company v. N L R B, 332 F.2d 447, 448–449 (4th Cir. 1964); Hartsell Mills Co. v. National Labor Relations Board, 111 F.2d 291, 292 (4th Cir. 1940).

II. *INTIMIDATION AND THREATS BY MEANS OF MASS TOURING*

■ The Board found that by posting "help wanted" signs and touring job

applicants through its plant, Southland threatened employees that they would lose their jobs if they had the temerity to strike, thereby violating section 8(a) (1) of the Act. The argument here is that the purpose was to intimidate the employees and create fear in their minds that if they struck they would be permanently replaced. The Board recognizes, as it must, that an employer is free to protect himself against the possibility of a strike by hiring a reservoir of replacements. Labor Board v. Mackay Co., 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). It contends, however, that in preparing for the strike, Southland exceeded the necessities of the situation and its prerogative when it took unusual measures which, in the circumstances, were coercive.

Southland contends that its actions were motivated by a desire to prepare both for the impending strike and for an anticipated upturn in its business operations. This, Southland says, accounts for its interviewing and touring through the plant more persons than ever before. Southland insists that these activities were normal incidents of its preparations for a strike, sanctioned by Mackay Co., and to the extent that they were preparations for an increased volume of business, they were equally unobjectionable.

Although, as shown by the conflict between the Board and its Trial Examiner, there is a substantial question as to whether or not Southland's pre-strike preparations were protected defensive activity, it is unnecessary for us to decide the substantiality of the evidence in support of the Board's finding of this 8 (a) (1) violation because, as explained below, we conclude that there is ample support for the Board's finding that the strike was caused by other unfair labor practices.

III.  *NATURE OF THE STRIKE*

Both the Board and its Examiner found, and Southland in its brief agrees, that the "immediate cause" of the strike was the posting of "help wanted" signs and touring applicants through the plant. Their agreement, however, goes no further.

The Trial Examiner concluded that there was no causal connection between the strike and Southland's prior unfair labor practice in refusing to bargain in good faith. This conclusion was based on his view that Murphy's *sole* reason for calling the strike was his feeling that Southland intended to discharge union members and hire new applicants, and that Murphy's later references to Southland's unfair labor practices were afterthoughts, conceived after April, 1963, when the union filed charges.

The Board found that:

"the evidence in its entirety, including all of Murphy's testimony, supports the inference that Respondent's unfair labor practices were * * * a principal cause of the strike call and the walkout by the employees."

It therefore concluded that even if Southland's recruitment procedures did not violate section 8(a) (1), the strike was an unfair labor practice strike.

Agreement of the parties that the touring episode "triggered" the strike still fails to provide the answer as to the cause and nature of the strike. The triggering event did not displace all that had gone before, as the company argues and the Examiner seemed to think. On the other hand, it would not necessarily constitute an independent threat violative of section 8(a) (1), as the Board held. In the view we take of the case we find it unnecessary to characterize with precision the touring of applicants through the plant. It is sufficient to say that the Board was well warranted in holding that the underlying cause, as distinguished from the immediate cause of the strike, was the intransigence of the employer and its dilatory tactics in respect to bargaining sessions. The aphorism concerning "the straw that broke the camel's back" expresses less than the truth if it is understood to attribute to the final straw sole responsibility while exonerating the much heavier

**708**

burden imposed by the many straws that preceded it. Even if the parading through the plant was the exasperating "last straw," it did not outweigh the persistent accumulation of earlier violations, and it would be an unjustifiable perversion of the record to conclude that they had no bearing on the union's decision to strike. That the strike was the full grown fruit of seeds earlier sown by Southland is most clearly demonstrated by the fact that the authorization pursuant to which Murphy called the strike was given him by the union in January, 1963, after he had expressed increasing concern about Southland's failure to bargain in good faith. Rather than being afterthoughts, as found by the Examiner, Murphy's concerns were of a much earlier vintage.

■ It is the Board's conclusion which we review, but in a case such as this where the findings of the Board are in conflict with those of its Trial Examiner, the record, including the Trial Examiner's report, must be subjected to particular scrutiny. And, as stated by the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951):

> "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion."

We must keep in mind, however, that the Examiner's report is to be given only "such probative force as it intrinsically commands." Universal Camera, supra, p. 495, 71 S.Ct. p. 468. Otherwise, the Examiner's report would always control the Board. As indicated above, we think that there was ample support for the Board's conclusion that the strike was caused by Southland's unfair labor practices.

## IV. *REINSTATEMENT*

■ Because this was an unfair labor practice strike, the strikers were entitled to immediate reinstatement to their jobs, and Southland's delay in reinstating them was violative of section 8(a) (3) and (1) of the Act. Mastro Plastics Corp. v. Labor Board, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Accordingly, they are entitled to such amounts as they would normally have earned less their actual earnings during the period from their requests for reinstatement to the date of their actual reinstatement.

The order of the Board will be enforced except for Paragraph 1(f) dealing with the touring of job applicants through the plant.

Enforced in part and denied in part.