**GEORGE BANTA COMPANY, INC.,
Banta Division, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 78–1437.

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1979.

Decided Aug. 6, 1979.

Rehearing and Rehearing En Banc
Denied Sept. 14, 1979.

Michael J. Rybicki, Chicago, Ill. (R. Theodore Clark, Jr., Jeffrey L. Madoff, Grant E. Morris, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for petitioner.

Christopher W. Katzenbach, NLRB, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, NLRB, Washington, D. C., on brief), for respondent.

Irving M. King, Thomas D. Allison, Peggy A. Hillman, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., on brief, for intervenor.

Before BRYAN, Senior Circuit Judge, HALL, Circuit Judge, and MacKENZIE,* District Judge.

K. K. HALL, Circuit Judge:

Petitioner George Banta Company, Inc. [Banta] seeks review of a National Labor Relations Board order enforcing a formal settlement stipulation signed by Banta, the union representing its employees, and the NLRB General Counsel. The Board approved the settlement, and issued its order, following its rejection of Banta's attempt to withdraw from the agreement. In seeking to set aside the order, Banta contends that it had an absolute right to withdraw at any time prior to the Board's approval of the settlement or, alternatively, that its withdrawal was justified by changed circumstances and Board delay. We find no merit to these contentions and, accordingly, grant the Board's cross-petition for enforcement of the order.

* Honorable John A. MacKenzie, United States District Judge for the Eastern District of Virginia, at Norfolk, sitting by designation.

## I.

Banta is engaged in the printing business and maintains two production facilities in Menasha, Wisconsin. Two groups of employees at these facilities, bindery and lithographic workers, are represented by the Graphic Arts International Union, AFL-CIO, CLC. In February, 1977, Banta and the Union began negotiations for a new collective bargaining agreement, to replace the existing one which was due to expire April 4, 1977. Negotiations continued until April 4, 1977, when Banta announced that it was immediately implementing its "last contract offer", including provisions for lengthening the work week and limiting employer contributions to a health insurance plan. On the same day, the Union membership voted not to work under the company's unilaterally imposed terms, and began a strike.

The Union subsequently accused the company of unfair labor practices, resulting in a complaint filed by the NLRB Regional Director on June 27, 1977. The complaint charged Banta with violating §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and 158(a)(1), by unilaterally changing wages, hours of work and other terms of employment, at a time when negotiations between the parties were continuing and when no bargaining impasse had occurred. It also characterized the resulting strike as an unfair labor practices strike.[1] A hearing on the complaint was scheduled for July 11, 1977. In addition, the Regional Director was granted Board authorization under § 10(j) of the Act, 29 U.S.C. § 160(j), to seek injunctive relief in district court to require recission of the alleged unfair labor practices pending resolution of the charge.

The scheduled hearing was never held, and the authorized injunctive relief against the company was never sought. Instead, Banta entered into settlement negotiations with the NLRB Regional Director, and on July 22, 1977, the company signed a settlement stipulation. The company agreed in the settlement, *inter alia*, to revoke implementation of its "last contract offer" of April 4, 1977, and to "revert to the wages, hours of work and other terms and conditions of employment which existed prior thereto, but excluding cost-of-living adjustments, arbitration procedure and union security." The stipulation contains a nonadmission clause, and does not expressly state that the strike was the result of unfair labor practices by the company. However, the agreement includes a statement of the striking employees' reinstatement rights, which coincide precisely with those of unfair labor practice strikers.[2]

The agreement provides that "[u]pon this Stipulation . . . and without any further notice of proceedings herein, the Board may enter an order forthwith" based upon the terms of the stipulation, and the company waives all defenses to judicial enforcement of the order. Finally, the document states that the "Stipulation is subject to the approval of the Board, and it shall be of no force and effect until the Board has granted such approval. Upon the Board's approval of the Stipulation, the Respondent [Banta] will immediately comply with the provisions of the order."

On August 5, 1977, the Union formally objected to the terms of the settlement, particularly its failure to provide for the cost-of-living adjustments which had been part of the collective bargaining agreement

---

1. "Unfair labor practice strikers" are entitled to immediate and nondiscriminatory reinstatement upon their unconditional offer to return to work, even if such reinstatement requires dismissal of replacements who have been hired to fill their jobs during the strike. An employer may refuse to reinstate "economic strikers" if the positions they left during the strike have been filled, although he may not discriminate on the basis of relative union activity when filling vacancies which remain when the strike is over. *E. g., NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); *NLRB v. Southland Cork Co.*, 342 F.2d 702 (4th Cir. 1965).

2. In a letter responding to concerns expressed by the Union, the Regional Director stated that "[t]he provisions of . . . the Settlement, in effect, provide that the strikers are unfair labor practice strikers until the notice posting period expires."

which expired on April 3, and requested a hearing.[3] The Regional Director rejected the Union's arguments, and its hearing request, finding that the stipulation "appears to remedy the violations found" and that "a hearing will unnecessarily delay . . . the remedy." On August 12, he signed the stipulation and submitted it to the NLRB General Counsel for approval.

The Union renewed its objections to the agreement, and on August 30, 1977, Union representatives met with members of the General Counsel's staff in Washington to discuss the objections. On September 20, the General Counsel notified the Union that, while the Union's right to continuing cost-of-living adjustments presented a "difficult and complex legal issue", he had signed the stipulation and had forwarded it to the Board with his recommendation that it be approved. The Union was given until October 5 to file its objections with the Board, and this deadline was subsequently extended to October 17 because of a substitution in the Union's counsel. In a telegram dated October 4, Banta strenuously objected to this time extension, stating:

Because of the tremendous delays that have occurred already in the processing of this formal settlement which was initially signed by Banta Division in early July, any further delay would cause irreparable harm, especially since the strike which commenced on April 4 is still in progress. Banta Division therefore requests that the requested extension be denied and/or revoked and that the Board expeditiously act on the formal settlement agreement that has already been recommended and approved by both the Regional Director and the General Counsel.

While the settlement agreement was thus progressing toward final Board approval, collective bargaining negotiations between Banta and the Union had resumed. On September 7, 1977, the company notified the Union that it was partially implementing the terms of the settlement stipulation. In a notice utilizing the exact language of the stipulation, Banta revoked implementation of its April 4 "last contract offer" and reverted to the previous conditions of employment as specified in the stipulation.

**3.** The Board's Statement of Procedures provides certain rights to a charging party who objects to a proposed settlement:

(c)(1) If after issuance of complaint but before opening of the hearing, the charging party will not join in a settlement tentatively agreed upon by the regional director, the respondent, and any other parties whose consent may be required, the regional director serves a copy of the proposed settlement agreement on the charging party with a brief written statement of the reasons for proposing its approval. Within 5 days after service of these documents, the charging party may file with the regional director a written statement of any objections to the proposed settlement. Such objections will be considered by the regional director in determining whether to approve the proposed settlement. If the settlement is approved by the regional director notwithstanding the objections, the charging party is so informed and provided a brief written statement of the reasons for the approval.

(2) If the settlement agreement approved by the regional director is a formal one, providing for the entry of a Board order, the settlement agreement together with the charging party's objections and the regional director's written statements, are submitted to Washington, D. C., where they are reviewed by the general counsel. If the general counsel decides to approve the settlement agreement, he shall so inform the charging party and submit the agreement and accompanying documents to the Board, upon whose approval the settlement is contingent. Within 7 days after service of notice of submission of the settlement agreement to the Board, the charging party may file with the Board in Washington, D. C., a further statement in support of his objections to the settlement agreement. 29 C.F.R. § 101.9.

In addition, the charging party may be entitled to a hearing on his objections to the settlement. *Compare Marine Engineers Beneficial Association v. NLRB*, 202 F.2d 546 (3d Cir.), cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953) (charging party is always entitled to a hearing on its objections to a settlement once a complaint has issued) *with Concrete Materials of Georgia, Inc. v. NLRB*, 440 F.2d 61 (5th Cir. 1971) (charging party entitled to an evidentiary hearing on any material issues of disputed fact presented by the objections). *Contra, Local 282, International Brotherhood of Teamsters v. NLRB*, 339 F.2d 795 (2d Cir. 1964) (charging party has no right to a hearing on its objections).

On October 8, 1977, following meetings at which the provisions of the settlement stipulation were explained to the Union membership, the Union signed the stipulation. The Union notified Banta that it had now joined in the settlement agreement and, in the same letter, accepted ·Banta's most recent contract proposal, reserving the right to challenge the proposal's reinstatement plan as not complying with the settlement stipulation or the relevant law. Banta accepted the striking employees' unconditional offer to return to work and immediately resumed production operations.

On October 20, 1977, the Union filed new unfair labor practice charges against Banta *[Banta II]*, accusing the company of violating both the National Labor Relations Act and the terms of the settlement stipulation by massive discrimination against returning employees who had participated in the strike. Five days later, Banta notified the Board that "in light of the great delay in approving Settlement . . . and due to new issues relative to the Settlement raised in *[Banta II]*, effective immediately the Employer withdraws its offer of Settlement."

Following extensive arguments by all parties, the Board, on July 14, 1978, refused to permit the company to withdraw from the stipulation and entered its order enforcing the agreement's terms. 236 NLRB 224 (1978).

Banta now petitions this court to set aside the Board's order, on the grounds that its October 25, 1977, letter to the Board effectively nullified its consent to the agreement. The Board cross-petitions for enforcement of the order, which it characterizes as a valid consent order.[4] The sole issue presented in our review of the order is whether the Board properly rejected Banta's· attempted withdrawal from the settlement stipulation.

## II.

■ Banta contends that, under both general contract law principles and the Board's own procedural rules, a party has an absolute right to withdraw from a settlement stipulation at any point prior to the agreement's approval by the Board. We see no merit to this contention.

■ Neither the Board's procedural rules nor any of its prior cases address the issue of the right to withdraw from a formal settlement stipulation in an unfair labor practice case.[5] The procedural rules cited

---

**4.** The Union has intervened to urge enforcement of the Board's order. *See UAW Local 283 v. Scofield*, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965).

**5.** Banta relies heavily on terminology in the Board's Statements of Procedure, 29 C.F.R. §§ 101.9, 102.51, describing settlement stipulations which have not yet been formally approved by the Regional Director as "*offers* of settlement" or "*proposed* settlements", to which the Regional Director has thus far only "*tentatively* agreed." The company apparently attaches no corresponding significance to the complete absence of any such descriptive terms in the rules' references to stipulations which have been approved by the Regional Director or the General Counsel. See text of rules, note 3, *supra*.

The other rules cited by Banta establish that every formal settlement is subject to Board approval, *e. g.*, 29 C.F.R. §§ 101.9(b)(1), 101.-9(c)(2), and provide that "[i]f the stipulation is not approved by the Board, the case will resume its status as before the execution." NLRB Casehandling Manual § 10174.

Similarly, the language of the stipulation signed by Banta does not address withdrawal by a party. It provides that the "Stipulation is subject to the approval of the Board, and it shall be of no force and effect until the Board has granted such approval. Upon the Board's approval of the Stipulation, the Respondent will immediately comply with the provisions of the order." We believe that this provision, taken as a whole, simply states that the respondent has no obligation to comply with the substantive terms of the settlement unless and until it is approved by the Board.

Banta also cites prior Board cases, particularly *NLRB v. Decker*, 322 F.2d 238 (8th Cir. 1965), and *NLRB v. Armstrong Tire & Rubber Co.*, 263 F.2d 680 (5th Cir. 1959), in support of its contention that the Board itself has never considered a settlement agreement which it has not yet approved to be binding on the parties. These cases all involved backpay specifications, intended to constitute compliance with previous Board orders, which had been negotiated by Regional Office personnel and had not been approved by the General Counsel or the Board. Most importantly, the only relevant issue in these cases was whether the specifica-

by Banta merely emphasize that no agreement between the General Counsel and a party charged with unfair labor practices can become a final disposition of the charges until the Board itself, exercising its duty to determine whether the settlement both remedies the alleged unfair practices and serves the broader public policies of the Act, approves it. We find nothing in the rules which could lead Banta to reasonably believe that its execution of the stipulation could be repudiated. at will after the General Counsel had accepted it in lieu of proceeding with the scheduled hearing.

We also reject Banta's characterization of the settlement stipulation as merely an offer by the company, which could be accepted only by the Board itself, and which, like any other contract offer, was revocable at any time prior to acceptance.

The Board held, and we agree, that this contention is based upon a misapprehension of the distinct roles of the Board and the General Counsel in the settlement process. The 1947 Taft-Hartley Amendments separated prosecutorial and adjudicatory functions under the Act by creating the office of General Counsel. *See I.L.G.W.U. Local 415–475 v. NLRB,* 163 U.S.App.D.C. 263, 501 F.2d 823 (1974). The General Counsel was given "final authority, on behalf of .the Board, in respect of the investigation of charges and issuance of complaints . . and in respect of the prosecution of such complaints before the Board." 29 U.S.C. § 153(d). In exercising these duties, the General Counsel acts "independently of any direction, control or review by the Board," H.Conf.Rep.No.510, 80th Cong., 1st Sess. 37 (1947), U.S.Code Cong. Serv.1947, pp. 1135, 1143, and his decisions regarding whether to issue a complaint charging unfair labor practices, and the scope of any such complaint issued, are not reviewable by either the Board or the courts. *Wellington Mill Division, West Point Manufacturing Co. v. NLRB,* 330 F.2d 579 (4th Cir. 1964). In formal settlement stipulations, the General Counsel exercises his statutory authority by agreeing not to litigate a charge, in return for the respondent's agreement to consent to a Board order, with judicial enforcement, requiring certain remedial action.

The settlement stipulation thus could be regarded as a binding agreement between the General Counsel and the respondent to settle, and to submit the stipulation to the Board for approval, *see* A. Corbin, Contracts § 61 (1952), but we do not believe that general contract law principles alone govern this issue. Although consent decrees are normally treated as contracts for purposes of construction, *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971),

[c]onsent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court or administrative agency. [citations omitted.] Because of this dual character, consent decrees are treated as contracts for some purposes but not for others. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, n. 10, 75 S.Ct. 926, 43 L.Ed.2d 148 (1975). *See also United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

Disposition of unfair labor practice charges involves not simply an adjustment of the rights of private parties, but also a broader public interest. *Cf. National Licorice Co. v. NLRB,* 309 U.S. 350, 362–64, 60 S.Ct. 569, 84 L.Ed. 799 (1940). Settlement agreements, as an alternative to lengthy adjudication, allow both the Board and the respondent to "save . . . time, expense, and inevitable risk of litigation", *Armour, supra,* 402 U.S. at 681, 91 S.Ct. at 1757. They permit the prompt remedying of a greater number of unfair labor practices, as well as speedy resolution of crippling labor disputes. To permit a respondent unilaterally to withdraw from a for-

---

tion was binding *on the Board.* That issue is quite distinct from the question of whether a

respondent may withdraw while Board action is pending.

mally executed settlement stipulation prior to Board approval would undermine the continued efficacy of the settlement process, and encourage its use as a dilatory tactic.

Similar policy considerations have led the courts to deny a party the right to withdraw unilaterally from Federal Trade Commission consent decrees, at a point where the agreement has been provisionally accepted by the Commission but is awaiting final agency approval following a public comment period. *Johnson Products Co. v. FTC*, 549 F.2d 35 (7th Cir. 1977); *Ford Motor Co. v. FTC*, 547 F.2d 954 (6th Cir. 1976). These courts concluded that the ultimate responsibility of the agency, to ensure that the public interest is served by a settlement, provides sufficient justification to permit the agency to withhold its final approval while denying the respondent a similar right to withdraw from the agreement. We agree, and believe that the rationale of these cases is fully applicable here, despite the differences in the two agencies' procedures.[6]

We therefore hold that a respondent in an unfair labor practices complaint, who joins with the General Counsel in executing a formal settlement stipulation to avoid litigation of the charge, has no right to withdraw unilaterally from that stipulation prior to its approval by the Board.

### III.

■ Banta also argues that, even absent an absolute right to withdraw from a settlement stipulation, the circumstances of this particular case make the Board's rejection of the attempted withdrawal arbitrary and capricious. We need not decide whether either changed circumstances or unreasonable delay in Board action on a settlement may ever require that a party be permitted to withdraw, for we find no such compelling circumstances in this case.

Banta contends that a party to a formal settlement stipulation "may reasonably expect expeditious handling of the General Counsel and Board approvals required." We agree, and believe that, in this case, the approvals were made in a reasonably expeditious manner. The delay between Banta's execution of the stipulation and the General Counsel's approval was the result of the Union's vigorous objections to the terms of the agreement—objections which it had every right to make, and which the Regional Director and General Counsel were obligated to carefully consider. See note 3, *supra*. The Union's objections were not frivolous, as both the Regional Director and General Counsel acknowledged. Nevertheless, the Union's request for a hearing on these objections was denied, in favor of a more expeditious resolution of the complaint. We believe that, under the circumstances, a two month delay in the General Counsel's approval cannot be considered unreasonable,[7] nor should it have been unexpected by Banta.

Further, neither the record nor Banta's arguments disclose any harm caused Banta by the delay which would justify its withdrawal. The only damage Banta ever complained of was due to the ongoing strike of its employees, a strike which had ended two weeks before Banta's attempted withdrawal from the settlement stipulation. The Union's October 8, 1977, letter to Banta demonstrates that, in ending the strike and returning to work, the Union was relying

6. The regulations of both agencies fail to address the right of a party to withdraw from a settlement agreement. Regardless of the desirability of such a regulation, it is clear that the choice between proceeding by general rule or by individual order generally lies with the Board. *E. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). And, "[a]lthough there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act", *id.* at 294, 94 S.Ct. at

1771, we find no such circumstances here, particularly since the Board's order does not represent a departure from a previously announced policy.

7. Banta also complains that final approval by the Board was not forthcoming until almost one year after the company executed the stipulation. But it has not contested the Board's assertion that this delay resulted from Banta's attempts to withdraw from the settlement.

on the reinstatement rights guaranteed under the settlement agreement.[8] It was only after the strike had ended, and the employees had returned in reliance on the settlement agreement's provisions for reinstatement, that the company announced its intention to withdraw from the agreement.

█ Banta's final argument[9] concerns the effect of *Banta II,* the litigation based on the Union's October 20, 1977, charge that the company's method of reinstating returning strikers constituted an unfair labor practice. The *Banta II* complaint characterizes the 1977 strike as an unfair labor practices strike, resulting from Banta's April 4, 1977, action in "unilaterally chang[ing] wages, hours of work and other terms and conditions of employment . . at a time when negotiations between the parties were continuing and at a time when bargaining impasse had not occurred." The complaint then charges Banta with the following violations of Section 8(a)(3) and (1) of the Act:

(a) On or about October 10, 1977, and thereafter, Respondent granted, and continues to grant, preferential reinstatement rights or preferential seniority rights to jobs and rates of pay to those employees who had abandoned the above-described strike and who offered to or did return to work at Respondent before the Charging Parties abandoned the strike against Respondent.

(b) On or about October 10, 1977, and thereafter, Respondent denied seniority and the benefits of seniority for purposes of job assignment and computation of rates of pay to those employees who had engaged in the strike against Respondent until abandoned by Charging Parties.

At the hearing on these charges, the General Counsel sought to introduce evidence that the company's April 4 action constituted an unlawful refusal to bargain and that

---

**8.** The Union's letter to Banta reads as follows:

We are writing to advise you of the following:

1. Local Union 32–B and Local Union 88–L, Graphic Arts International Union, AFL-CIO, CLC, have today signed the Settlement Stipulation previously entered into by the Company and the National Labor Relations Board [citations omitted].

2. You are hereby advised that the strike . . . has been ended and we make an unconditional offer on behalf of all members of Local Union 32–B and Local Union 88–L and all employees in the units represented by these locals to return immediately to work at the Banta Division. Since you told us that you will be able to advise us on Monday, October 10 as to how fast you can resume operations, we will expect to hear from you on that date as to when you want the employees to report for work.

3. The membership of Local Union 32–B and the membership of Local Union 88–L have today accepted the contract offer made by the Company on October 6 and 7, 1977, concerning the terms and conditions of their employment.

4. We do not agree with the Company's interpretation of the statutory rights of returning employees, as set forth in the Company's Preferential Reinstatement System. We will rely on the statutory rights of reinstatement as provided by the statute and the Settlement Stipulation described above, and, of course, we do not waive any of those rights.

Following correspondence as to the effect of the Union's objection to the company's Preferential Reinstatement System, Banta responded, on October 10, 1977, with a letter confirming the terms of the new contract. This letter reads, in relevant part:

It is our understanding that while you have accepted our total offer, you have reserved the right to challenge the legality of all or portions of the Preferential Reinstatement System. This is, of course your right, and we do not construe your acceptance of our total offer as a waiver of any rights under the NLRA except to the extent such rights are waivable and have been waived by the language of the Agreement.

The company never gave the Union any indication that its expressed reliance on the settlement stipulation was misplaced.

**9.** In its argument before the Board, Banta also contended that its attempted withdrawal was motivated in part by concern that the Board's recent decision in *VanTran Electric Corp.,* 231 NLRB 169 (1977) *enf. denied,* 580 F.2d 921 (7th Cir. 1978), could result in the settlement agreement becoming the basis for a finding of subsequent violations of the Act, without benefit of full litigation of such alleged violations. Banta briefly renews this argument here. We believe that the Board properly rejected the argument since, even assuming that a change in relevant law might justify withdrawal, VanTran did not represent such a change. *See Pride Refining, Inc.,* 224 NLRB 1353 (1976), *enf. denied,* 555 F.2d 453 (5th Cir. 1977).

the resulting strike was an unfair labor practices strike. The General Counsel stated that he "does not seek any remedial relief for the 8(a)(5) violation of April 4, 1977. Evidence of [this violation] will be used by General Counsel only as background to throw light on Respondent's conduct in granting superseniority to those employees who prematurely abandoned Unions' strike . . . [and] to properly analyze the rights of the six strikers discharged for alleged strike misconduct." The Administrative Law Judge presiding at the hearing refused to admit this evidence, ruling that "these matters have been disposed of by the Board's Decision and Order [enforcing the settlement stipulation] and the obligation imposed thereby." The Board reversed the ALJ, and ordered him to receive the evidence "for background purposes".

This Board ruling, according to Banta, results in full litigation of the same issues involved in the June 27, 1977, complaint—litigation of which the settlement stipulation was designed to avoid. Therefore, the company argues, the Board is abusing its discretion by attempting to enforce the company's obligations under the settlement while simultaneously depriving the company of one of its expected benefits from the agreement.

The record before us does not establish whether *Banta II* represents a full litigation of the issues purportedly resolved in the settlement stipulation, and we express no opinion on the propriety of the Board's actions in that litigation. The *Banta II* proceeding, which seeks a remedy only for post-strike violations of the Act, is not a substitute for the settlement agreement designed to remedy pre-strike violations. We believe that any objections Banta may have to the scope of the *Banta II* litigation should be raised in that litigation.

Banta received significant immediate benefits from its execution of the settlement stipulation. The General Counsel indefinitely suspended the scheduled hearing, failed to seek the authorized injunctive relief, and rejected the Union's claim for continued cost-of-living adjustments. The Union members terminated their strike and returned to work. The General Counsel and the Union necessarily relied on the company's corollary future commitments—to restore the pre-existing contract terms, to post a remedial notice to its employees, and to recognize the status of its employees as unfair labor practice strikers. To permit a party to accept the benefits of a settlement agreement, and then withdraw from that agreement without complying with its corresponding obligations, would subvert the settlement process. We believe that the Board properly refused to allow this abuse of its procedures, and accordingly we enforce the Board's order.

*ENFORCEMENT GRANTED.*

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

With deference to my brothers, the proposed opinion fails to recognize that General Counsel, rather than Banta (the Company), abrogated the Settlement Stipulation (the contract) in substantial and material points, justifying Banta's disaffirmance and termination of the agreement.

The fact is that General Counsel—unintentionally, of course, but nonetheless actually—misled Banta into signing the contract by asserting the immediacy of its effectuation. On July 22, 1977, Banta, therefore, signed the contract, less than a month after the Regional Director filed the complaint. As submitted to the Company, the Stipulation declared that without any further notice the Company consented to the entry "*forthwith*" of an order by the Board requiring Banta to comply with the terms of the agreement and preventing it from raising any defenses to the judicial enforcement of the order.

Obviously, "*forthwith*" denoted and connoted expedition. Since the Company had been embroiled in the throes of a strike for over three months, plainly, prompt resolution of the problem was the inducement of Banta's ready joinder in the contract. It was in this spirit that the Company signed before either the Union or, indeed, the Gen-

eral Counsel had done so. With Banta's signature secured, however, the spirit of expedition abruptly vanished due to the utter laxity of General Counsel, which prevented dispatch in completing the execution of the contract.

## I.

After July 22, for two and a half months, General Counsel was inexplicably inactive in fulfilling his commitment to act "forthwith." Although termination of the walkout hung on the contract's approval, even the Regional Director did not sign the Stipulation until August 11. The next day, the paper was sent to General Counsel. Ignoring the urgency of Banta's circumstances, General Counsel deplorably did not approve the Stipulation for six weeks. During its two-month wait, the Company faithfully and regularly, but in vain, reminded General Counsel that the strike was still afoot and the lagging pace was creating grave problems. Indeed, prior to his approval, the Company had protested to General Counsel that further delays would require it to withdraw from the Stipulation.

The Union constantly opposed the Stipulation. General Counsel, on September 20, notified it that he had executed the Stipulation and had sent it to the Board, recommending approval. At the Union's request, he extended the time for filing objections with the Board until October 5. When this deadline was postponed to October 17, Banta forcefully, but hopelessly, complained saying:

> Because of the tremendous delays that have occurred already in the processing of this formal settlement which was initially signed by Banta Division in early July, any further delay would cause irreparable harm, especially since the strike which commenced on April 4 is still in progress. Banta Division therefore requests that the requested extension be denied and/or revoked and that the Board expeditiously act on the formal settlement agreement that has already been recommended and approved by both the Regional Director and the General Counsel.

Ultimately, October 8, the Union signed the Stipulation and notified Banta, simultaneously. The strike ended October 8. Banta at once accepted the strikers' unconditional offer to return to work and resumed its own operations immediately. On October 20, the Union filed new unfair labor practice charges against Banta. Five days later, October 25, 1977, in understandable exasperation, Banta advised the Board that "in light of the great delay in approving Settlement," it was withdrawing from the Stipulation "effective immediately."

Despite the hurt suffered by Banta, enduring a lengthy strike, aggravated by General Counsel's inordinate dallying, the majority suggests that no injury was done the Company. The majority refuses to impute the delay to General Counsel's tarrying, ascribing it rather to the Union's hostility toward the Stipulation. Even if that were so, it was hardly just for General Counsel to temporize with the Union at the expense of the Company. If the Stipulation could not be implemented "forthwith," as precisely indicated in the provision which engaged Banta's acceptance, then in justice General Counsel was bound to evince concern and take immediate steps for the Company's relief. This was but another unmet contract obligation of General Counsel, entitling Banta to withdraw.

Noteworthy here is the majority's observation that "[t]o permit a respondent unilaterally to withdraw from a formally executed settlement stipulation prior to Board approval would . . . encourage its use as a dilatory tactic." But how much more of an inciting tactic is it to allow General Counsel to stymie a Settlement Stipulation by simply dawdling in the consummation of it.

## II.

In considering whether the Company transgressed the Settlement Stipulation, it is, of course, acknowledged that the roles of General Counsel and the Board are distinct, the first prosecutorial, the latter adjudica-

tory. Nor is it disputed that General Counsel, not the Board, was the party contracting with the Company.

Unquestionably, too, the Settlement Stipulation was the equivalent of a consent decree. Decision upon its continued vitality, breach and termination is governed by the law of contracts, and not contract law jointly with Federal labor statutes, as the majority suggests. The authorities speak as one on this theorem, even in instances such as that here, when an administrative agency offers the forum. Summing the precedents, the Court in *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–935, 43 L.Ed.2d 148 (1975), stated:

> Thus, the basic import of [*United States v.*] *Armour* [*& Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)], [*United States v.*] *Atlantic Refining* [*Co.*, 360 U.S. 19, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959)], and *Hughes* [*v. United States*, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952)] is that, since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation. (Footnote omitted.)

With General Counsel defaulting in performance of a fundamental purpose and proviso in his contract by failing to act "forthwith," the Company was justified in disaffirming the Stipulation. "A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." Restatement of Contracts § 397 (1932).

The late Judge Parker enunciated for this court, in *Sylvania Industrial Corp. v. Lilienfield's Estate*, 132 F.2d 887, 892 (4th Cir. 1943): "[I]t is well settled that in proper cases *rescission may be granted for default in performance*." (Accent added and citations omitted.) Moreover, in *Hogue v. Pellerin Laundry Machinery Sales Co., Inc.*,

353 F.2d 772, 774 (8th Cir. 1965), it is noted that

> In Williston's language, " * * * rescission is imposed *in invitum* by the law at the option of the injured party, and it * * * in general is allowed * * * for any breach of contract of so material and substantial a nature as would constitute a defense to an action brought by the party in default for a refusal to proceed with the contract." Williston on Contracts (Rev.Ed.), § 1467. (Additional citation omitted.)

Further, in *United States v. Southern Construction Co., Inc.*, 293 F.2d 493, 498 (6th Cir. 1961), it was stated: "Appellant relies upon the well-settled rule that under certain conditions a material breach of contract by one of the parties thereto confers upon the other party to the contract the right to rescind and abandon the contract . . . ."

Enforcement of the Board's order should be declined.