GEORGE BANTA COMPANY, INC., BANTA DIVISION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Tri-Cities Local 382, Graphic Arts International Union, AFL–CIO, Intervenor.

No. 81–1816.

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1982.

Decided Aug. 13, 1982.

As Amended Aug. 15, 1982.

R. Theodore Clark, Jr., Chicago, Ill., with whom Joel H. Kaplan and James P. Osick, Chicago, Ill., were on the brief, for petitioner. Fred S. Sommer, Chicago, Ill., also entered an appearance for petitioner.

Collis Suzanne Stocking, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., was on the brief, for respondent.

Thomas D. Allison, Chicago, Ill., with whom Eugene Cotton, Chicago, Ill., was on the brief, for intervenor.

Before MacKINNON and MIKVA, Circuit Judges, and COWEN,* Senior Judge, United States Court of Claims.

Opinion for the court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In July 1981, the National Labor Relations Board (NLRB) found that George Banta Co., Inc. (Banta) violated the National Labor Relations Act by granting preferential reinstatement and seniority rights to employees who abandoned a 1977 strike before the strike ended, and by denying the benefits of seniority for purposes of job assignment and computation of rates of pay to other employees who remained on strike as long as the strike lasted. The company petitions for review of the order, and the NLRB cross-applies for enforcement. We find the company's arguments without merit and grant enforcement of the Board's order.

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. In early 1977, Banta's employees were represented by two locals of the Graphic Arts Inter-

## I. BACKGROUND

In 1977, Banta employed some 1,150 printers and other workers at its production facilities in Menasha, Wisconsin. Collective bargaining agreements were set to expire on April 3, 1977, and negotiations for a new contract began in February between Banta and employee representatives (the Union).[1] In mid-March, the Union declared the parties at an impasse and called in a mediator. Bargaining continued until the early morning hours of April 4, the day after the former contracts had expired.

On April 4, Banta announced that it was immediately implementing its last contract offer, with provisions lengthening the work week and limiting company contributions to a health insurance plan. The Union membership voted on the same day not to work under these unilaterally imposed terms, and began a strike. The Union then accused Banta of committing unfair labor practices, and in June the NLRB Regional Director filed a complaint against the company charging violations of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (a)(5). A hearing on these unfair labor practice charges was set for July, 1977.

The hearing was not held, however, because Banta entered settlement negotiations with the NLRB Regional Director. On July 22, 1977, Banta signed a Settlement Stipulation agreeing to revoke the implementation of its last contract offer. The Settlement Stipulation also contained a provision for the reinstatement of strikers to their former or substantially equivalent positions, if jobs were available, upon their making an unconditional offer to return to work. This settlement was expressly contingent on NLRB approval, however, and the strike continued in full force. The Union objected formally to the agreement's terms in August, 1977, and requested a hearing on its arguments. On September

national Union, Local 32–B and Local 88–L. These two locals merged in March 1978 to form Tri-Cities Local 382, Graphic Arts International Union, AFL–CIO.

22, 1977, the NLRB General Counsel rejected the Union's arguments, signed the Settlement Stipulation, and forwarded it to the Board for approval.

Banta and the Union resumed their negotiations in the same month, and a number of strikers began returning to work even though the strike had not ended. Banta, anticipating a greatly curtailed workforce as a consequence of the strike, had earlier drawn up a Preferential Reinstatement System (PRS) governing the return of these employees. The company now proposed that the PRS also govern the return of employees at the strike's end, and presented the PRS to the Union on October 4, 1977.

The course of negotiations over the next week will sound familiar to students of the so-called "battle-of-the-forms" in the context of commercial law. The Union objected strenuously to the PRS, arguing that employees should be reinstated after the strike based on their unit seniority. On October 6, Banta responded with a contract proposal that again included the PRS, which it called an "absolute last and final" offer. When the Union repeated that the contract was unacceptable, Banta officials left the meeting. On October 8, however, the Union members voted to accept Banta's proposal, and authorized the Union to make an unconditional offer to return to work. The members also voted to inform Banta that the PRS was not in accordance with their legal rights under the Act. The Union signed the Settlement Stipulation and made the unconditional offer to return to work on the same day, adding:

> We do not agree with the Company's interpretation of the statutory rights of returning employees, as set forth in the PRS. We will rely on the statutory rights of reinstatement as provided by the NLRA and the Settlement Stipulation described above, and, of course, we do not waive any of those rights.

Banta accepted the unconditional offer to return to work, but noted that the PRS

was and is an integral part of our October 6, 1977, offer. Since you have not accepted our total offer, there is no contract between the employer and [the Union]. Construing your letter as a counter proposal, we reject it for reasons previously advanced.

Two days later, the Union reaffirmed its intention to accept the "total offer, including your PRS, to the full extent that the PRS does not violate the legal reinstatement rights of the striking employees." The Union added:

> If it is the entent [sic] of your letter of October 8, 1977 to assert that it was a condition of your offer that there be a waiver of the right to present to the NLRB any question as to the legal reinstatement rights of the strikers which may not be essectuated [sic] by your proposed PRS, please advise us so that we may give further consideration to our position.

Banta now responded:

> It is our understanding that while you have accepted our total offer, you have reserved the right to challenge the legality of all or portions of the PRS. This is, of course, your right and we do not construe your acceptance of our total offer as a waiver of any rights under the [Act] except to the extent such rights are waivable and have been waived by the language of the Agreement.

With these conciliatory words masking the obviously serious disagreement remaining between the parties, the strike came to an end.[2]

On October 20, 1977, the Union filed a second set of unfair labor practice charges against Banta alleging that the PRS violated sections 8(a)(1) and 8(a)(3) of the Act. The Union also alleged that the PRS violated the terms of the Settlement Stipulation, *which had still not been approved by the NLRB*. The Board's delay now caused a bifurcation of the legal proceedings. One fork involved Banta's attempt to withdraw

---

**2.** The statements quoted above were made in a series of letters exchanged by Banta and the Union between October 8 and October 10, 1977. *See* Joint Appendix (J.A.) 143, 145, 146, 147.

from the Settlement Stipulation; the second led to the Board order that is under review in this case.

### A. Banta's Efforts to Withdraw from the Settlement

Five days after the Union filed the second set of unfair labor charges, Banta notified the NLRB that

in light of the great delay in approving Settlement . . . and due to new issues relative to the Settlement raised [by the Union], effective immediately the Employer withdraws its offer of Settlement.

The NLRB conducted hearings and ultimately refused to allow Banta to withdraw from the Settlement Stipulation. It entered an order enforcing the terms of this settlement on July 14, 1978, and Banta appealed to the Fourth Circuit. In August 1979, the Fourth Circuit issued its decision in *George Banta Co. v. NLRB*, 604 F.2d 830 (4th Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), hereinafter cited as *Banta I*. The Fourth Circuit enforced the NLRB's order, holding that Banta could not unilaterally withdraw from the Settlement Stipulation prior to the Board's approval.[3] *Banta I* recognized that the ongoing litigation of the Union's most recent charges (*Banta II*) might be mooted by the Settlement, but added:

The record before us does not establish whether *Banta II* represents a full litigation of the issues purportedly resolved in the settlement stipulation, and we express no opinion on the propriety of the Board's actions in that litigation. The

*Banta II* proceeding, which seeks a remedy only for post-strike violations of the Act, is not a substitute for the settlement agreement designed to remedy pre-strike violations. We believe that any objections Banta may have to the scope of the *Banta II* litigation should be raised in that litigation.

604 F.2d at 838.

### B. Banta's Efforts to Justify the PRS under the Act

In April 1978, several months before the NLRB rejected Banta's efforts to withdraw from the Settlement Stipulation, the Regional Director issued a Complaint against Banta based primarily on the Union's second set of unfair labor practice charges.[4] The Complaint charged that Banta's method of reinstating returning strikers constituted an unfair labor practice under sections 8(a)(1) and 8(a)(3) of the Act. No reference was made to the Settlement, whose validity Banta was still challenging.

 Hearings on the Complaint began before an administrative law judge (ALJ) on August 21, 1978. By this time, the NLRB had approved the Settlement but the status of the Settlement now depended on the outcome of Banta's appeal to the Fourth Circuit in *Banta I*. The inability to rely on the Settlement presented difficulties to counsel for the NLRB General Counsel (NLRB counsel); he therefore proceeded on the assumption that Banta's PRS was unlawful under the Act only if the strike had concerned unfair labor practices.[5] As

---

3. Judge Bryan dissented on the ground that the General Counsel's "utter laxity" in completing execution of the Settlement abrogated the Settlement Stipulation and justified Banta's termination of the agreement. 604 F.2d at 838–39. The dissent characterized the General Counsel's inaction as inexplicable and deplorable, and suggested that Banta felt "understandable exasperation" at the General Counsel's "inordinate dallying" and "dawdling." *Id.* at 839.

4. Consolidated with this Complaint were charges that Banta had violated Section 8(a)(1) of the Act by discharging seven employees for strike-related misconduct. The Board affirmed the ALJ's finding that Banta had committed violations with regard to three of these employ-

ees, and Banta does not challenge that finding here. Brief for Petitioner Banta (Banta Brief) at 15 n.11. We therefore grant enforcement of the portions of the Board's order concerning these discharges without further review.

5. An "unfair labor practice strike" is a strike caused by an employer's commission of unfair labor practices; an "economic strike" is a strike over wages, hours, or terms and conditions of employment. Both economic and unfair labor practice strikers retain their status as "employees" under Section 2(3) of the Act, 29 U.S.C. § 152(3), but their reinstatement rights may vary. *See* p. 20 *infra.*

NLRB counsel stated during the hearing: "We are not attacking the validity of the PRS if it's found to have been an economic strike." Hearing Transcript, Joint Appendix (J.A.) 657. To NLRB counsel, the Settlement proved that the earlier strike had concerned labor practices rather than economic issues. In light of Banta's continuing attacks on the Settlement's validity, however, NLRB counsel announced early in the hearing that he planned to introduce evidence demonstrating that Banta had acted unilaterally on April 4, 1977, thus showing that the strikers were protesting unfair labor practices.

Banta opposed the introduction of this evidence. The ALJ issued a preliminary ruling that because the strikers' reinstatement rights would be considered in the context of the Settlement, it was unnecessary to litigate whether the strike had been economic or not. Both parties filed interim appeals with the NLRB. Banta challenged the ruling that reinstatement rights would be determined by the Settlement, which was still under legal attack, and the General Counsel challenged the ALJ's refusal to allow background testimony about the events of April 4, 1977, in light of the possibility that the Settlement might be overturned by the Fourth Circuit. In September 1978, the NLRB affirmed the ALJ's ruling that the Settlement was dispositive of the unfair labor practice issue for purposes of considering the strikers' reinstatement rights. The NLRB reversed the ALJ on the second issue, however, and allowed the introduction of background testimony concerning the initiation of the strike on April 4, 1977. The hearing then resumed before the ALJ.

In October 1978, the ALJ issued a 76-page decision finding Banta's PRS "inherently discriminatory and unlawful" under the Act, regardless of the validity of the Settlement or whether the strike concerned economic as opposed to unfair labor practice issues. In an alternative holding, the ALJ ruled that even if the legality of the PRS depended on whether the strike had been economic or caused by unfair labor practices, the Settlement gave Banta's employees reinstatement rights as unfair labor practice strikers. Finally, the ALJ found that a bargaining impasse *had* existed on April 4, 1977, and that contrary to the weight of the Settlement Stipulation the strike had therefore been economic rather than based on unfair labor practices. This latter finding wrapped up the issues raised during the hearing by the NLRB's introduction of background testimony concerning the events of April 4, 1977, but was totally irrelevant to the ALJ's conclusion that the PRS was unlawful under both the Settlement and the Act.

Banta appealed to the NLRB, but before the appeal was heard the Fourth Circuit issued *Banta I*. The decision considerably eased the Board's review because it preserved the ALJ's alternative basis for finding the PRS unlawful. On July 16, 1981, the NLRB adopted the ALJ's order, and affirmed the ALJ's "rulings, findings, and conclusions" with one exception. In a footnote to this phrase, the Board stated:

> Inasmuch as we find the reinstatement rights of the strikers herein to have been determined by our Decision and Order in [*Banta I*], we find it unnecessary to reach or pass upon the issue of whether Respondent and the Charging Party had reached a bargaining impasse or whether the ensuing strike was an economic or an unfair labor practice strike.

256 NLRB ——, —— n.4 (1981), J.A. 82, 83 n.4. It is from this order of the Board that Banta appeals.

## II. DISCUSSION

From start to finish, the chief difficulty in this case has been the multitude of alternative grounds for finding Banta's liability. Early in the NLRB proceedings, when the Settlement's validity was still in doubt, NLRB counsel operated on the assumption that Banta should be found liable under the Act because the April 4, 1977, strike concerned unfair labor practices. By the time the ALJ rendered his initial decision, the Board had rejected Banta's attempts to withdraw from the Settlement and the ALJ was thus free to use the Settlement as an

16

alternative ground for his holding. In addition, the ALJ went beyond the contentions of NLRB counsel and held that Banta's PRS was unlawful under the Act even if the April 4, 1977, strike was economic. By the time the Board decided the appeal from the ALJ's decision, the Fourth Circuit had issued its decision in *Banta I*, thus leading the Board to state that "we find the reinstatement rights of the strikers herein to have been determined by" that case. 256 NLRB at —— n.4, J.A. 83 n.4.

The proliferation of grounds for finding Banta's PRS unlawful has made a tangle of what would otherwise be a straightforward case. Banta interprets the Board's footnote 4 as limiting the Board's affirmance of the ALJ to the basis of the Settlement found binding in *Banta I*. Banta then contends that this is an improper basis for the Board's decision, giving two grounds. First, Banta argues that the NLRB is without jurisdiction to enforce compliance with an order of the Fourth Circuit. Second, Banta claims that its due process rights have been violated because its liability under the Settlement was neither alleged in the Complaint nor fairly and fully litigated before the ALJ. After thus dealing with the Board's order, Banta goes on to challenge the ALJ's finding that it was also liable under the Act. In this context, Banta argues that because the strikers were economic, the PRS did not abridge their statutory reinstatement rights. Even if this were not the case, Banta continues, the negotiated PRS constituted a clear waiver of whatever statutory rights the strikers may have had. Finally, even if these rights were not waived by contract, Banta urges that it violates due process to find Banta liable under the Act because the NLRB counsel neither alleged nor litigated the issue of whether the PRS was statutorily invalid given the economic nature of the strike.

In fairness to the parties, and not because all of the discussion is essential to our holding, we set out Banta's arguments and our reasons for rejecting them below.

## A. The NLRB's Reliance on the Settlement

 Section 10(e) of the Act provides that when a federal court is petitioned to review an order of the NLRB, exclusive jurisdiction over the case vests in the court:

Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final . . . .

29 U.S.C. § 160(e). Absent a remand, the Board may neither reopen nor make additional rulings on a case once exclusive jurisdiction vests in the reviewing court. *See, e.g., Service Employees Int'l Union Local 250 v. NLRB*, 640 F.2d 1042, 1043–46 (9th Cir. 1981). If approved or enforced by a reviewing court, a Board order necessarily becomes an order of the court, and the court rather than the Board has jurisdiction to enforce compliance. If the Board believes that a party has failed to comply with a court order, the Board may institute contempt proceedings in the appropriate court. *See Amalgamated Utility Workers v. Consolidated Edison Co.*, 309 U.S. 261, 270, 60 S.Ct. 561, 565, 84 L.Ed. 738 (1940).

 Banta contends that because the Settlement was approved and enforced in *Banta I*, that order is enforceable only through a contempt proceeding in the Fourth Circuit. This claim utterly mischaracterizes the Board's action in the proceeding before us and glosses over material differences between this case and *Banta I*. As the Fourth Circuit noted in *Banta I*,

[t]he *Banta II* proceeding, which seeks a remedy only for post-strike violations of the Act, is not a substitute for the settlement agreement designed to remedy pre-strike violations.

604 F.2d at 838. The central issue in *Banta I* was whether the company could withdraw from a Settlement Stipulation because of the Board's delay in approving that settlement. *Banta I* is thus entirely collateral to the litigation here, because nothing in that decision concerns the compatibility of the PRS with the reinstatement rights guaranteed by Banta in the settlement. Banta did not even draw up the PRS until after it had

executed the Settlement Stipulation. There is a clear distinction between adjudicating whether a contract exists, and determining whether an act complies with the contract's terms.[6] The NLRB obviously had jurisdiction to hear the Union's challenges to the PRS under the Act, and at its worst footnote 4 simply states that an intervening judicial decision made it unnecessary for the NLRB to reach certain questions.[7] We cannot view the Board's actions here as an impermissible attempt to enforce compliance with the Fourth Circuit's order in *Banta I.*

We take far more seriously Banta's contention that the Board's order bases liability on an allegation neither made in the Complaint nor litigated at the hearing. It is axiomatic that "[t]he Board may not make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent hearing." *NLRB v. Blake Construction Co.*, 663 F.2d 272, 279 (D.C.Cir.1981); *see Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055 (1st Cir. 1981); *Amalgamated Meat Cutters Local 567 v. NLRB*, 663 F.2d 223 (D.C.Cir. 1980). "Even where the record contains evidence supporting a remedial order, the court will not grant enforcement in the absence of either a supporting allegation in the complaint or a meaningful opportunity to litigate the underlying issue in the hearing itself." *NLRB v. Blake Construction Co.*, 663 F.2d at 279. We must agree with Banta that the Complaint did not allege Banta's violation of any term of the Settlement, and that a serious issue of due process would exist had the Board based its order solely on an unrelated agreement that played no part in the proceedings before the ALJ.

Banta's contention has no merit, however, for two reasons. First, from the outset of the hearings when the ALJ issued his preliminary ruling that it was irrelevant whether the April 4, 1977, strike had been economic or not, Banta was on express notice that its employee's post-strike reinstatement rights would be determined by the settlement agreement. The ALJ explained:

> The Board's Decision and Order (236 NLRB No. 224) imposes an obligation upon Respondent Employer with respect to its alleged bad faith bargaining and the reinstatement rights of the strikers. Respondent Employer must of course comply with this outstanding obligation and, consequently, the current Section 8(a)(3) allegations pending before me will be assessed in the context of Employer's continuing duty to comply with the Board's Decision and Order.... The earlier Decision and Order imposed an obligation upon the Employer which is a continuing obligation.

ALJ Ruling and Order, August 30, 1978, at 3–4, J.A. 782–83. Both Banta and the Union filed interim appeals from this preliminary order, and Banta's appeal concerned this ruling in particular. Its attempt was unsuccessful. By no means may Banta now suggest credibly that its liability under the Settlement came as a surprise, or that this issue was not fully and fairly litigated.

The ALJ based his preliminary ruling on *Poole Foundry & Machine Co. v. NLRB*, 192 F.2d 740 (4th Cir. 1951), *cert. denied*, 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952), which held that settlement agreements establish rights and liabilities that not only can, but must be recognized in subsequent Board proceedings.

---

**6.** Although these claims are usually raised in the same proceeding for reasons of economy, this is not always the case. *See, e.g., Mosher Steel Co.*, 226 NLRB 1163 (1976), *enforced sub nom. Mosher Steel Co. v. NLRB*, 568 F.2d 436 (5th Cir. 1978), which concerned an unlawful failure to reinstate strikers earlier found to have the reinstatement rights of unfair labor practice strikers in *Mosher Steel Co.*, 220 NLRB 336 (1975), *enforced mem. sub nom.*

*Mosher Steel Co. v. NLRB*, 532 F.2d 1374 (5th Cir. 1976).

**7.** *Banta I* may thus be analogized to any other intervening judicial decision that collaterally resolves an issue of law in a case pending before the NLRB. It is clever to characterize the Board's action here as an effort to enforce compliance with *Banta I*, but it is more accurate to say that *Banta I* took certain aspects of this proceeding out of the Board's hands.

While not an admission of past liability, a settlement does constitute a basis for future liability and the parties recognize a status thereby fixed.

*Id.* at 743. At the time the NLRB counsel began to proceed against Banta, the company was aggressively attempting to withdraw from the Settlement Stipulation and it is not surprising that NLRB counsel did not rely on the settlement agreement. It should be noted, however, that the reinstatement rights guaranteed by that agreement differ in no respect from the statutory reinstatement rights of employees who participate in unfair labor practice strikes.[8] When NLRB counsel attempted to show that the April 4, 1977, strike concerned unfair labor practices, he sought nothing more or less than reestablishment under the Act of the reinstatement procedures set forth in the Settlement. In this sense, the Board's footnote reference to the Settlement simply may not be given the narrow reading that Banta urges. Banta's due process complaint is unavailing because the Complaint's allegations under the Act and the terms fixed in the Settlement go to the identical "underlying issue." *NLRB v. Blake Construction Co.,* 663 F.2d at 279. Whether Banta's PRS was tested against the standard set by the Act or the terms of the Settlement, the issues were the same.

### B. *The Requirements of the Act*

Section 7 of the Act guarantees employees

the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

29 U.S.C. § 157. Section 8(a)(1) provides that it "shall be an unfair labor practice for an employer˙ . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157," 29 U.S.C. § 158(a)(1), and section 8(a)(3) prohibits employer discrimination against employees engaging in union activities protected by section 7. 29 U.S.C. § 158(a)(3).

There is unquestionably substantial evidence on the record to support the NLRB's finding that Banta violated sections 8(a)(1) and 8(a)(3) by granting preferential reinstatement and seniority rights to returning employees who abandoned the strike before the strike ended. Under Banta's PRS, the company retained in active employment all "cross-overs"—employees who had abandoned the strike early and crossed over the picket line. Banta assigned each "cross-over" the job classification and wage rate held by the employee before the strike regardless of the company's production requirements or the work actually performed by the employee during the strike. Those full-term strikers who were called back were assigned the remaining work at whatever classification status Banta deemed appropriate, and thus a difference of a few hours caused by whether an employee offered to return to work before or after the strike's end had significant repercussions to the employee's wage rate and other benefits.[9] Banta does not dispute

---

**8.** The Complaint filed by the NLRB against Banta in June 1977 alleged that the strike concerned unfair labor practices, and the Settlement Stipulation phrased the terms of reinstatement accordingly. As the Fourth Circuit noted in *Banta I,* "the agreement includes a statement of the striking employees' reinstatement rights, which coincide precisely with those of unfair labor practice strikers." 604 F.2d at 832.

**9.** For example, pressman Don Williams had been employed by Banta for more than 23 years and was earning $10.29 per hour immediately before the strike. On Friday, October 7, 1977, Williams telephoned a Banta official and stated that he was willing to return to work the following Monday "with or without" the Union, although he hoped the Union membership would vote to accept Banta's contract proposal the next day. Williams said that if the membership rejected the contract he would resign from the Union and return to work. On Sunday, October 9, a Banta representative telephoned Williams and asked whether he "wanted to be on the preferential reinstatement list." Williams replied that he would "go back with the Union." When Williams reported to work, he was reclassified to a lower position earning $7.58 per hour, even though his co-workers who had abandoned the Union had been assigned to their pre-strike classifications and

the discriminatory effect of the PRS, and it is not necessary to discuss the preferential reinstatement system in great detail.

Instead, Banta claims that the PRS gave "cross-overs" no *prospective* benefits of the sort condemned in *Erie Resistor Corp.*, 132 NLRB 621 (1961), *aff'd sub nom. NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) (inherently discriminatory to grant twenty years super-seniority for layoff purposes to strike replacements and employees abandoning a strike), and that the PRS was justified by Banta's legitimate business needs. The second argument was correctly rejected by the ALJ,[10] and the first is completely spurious. It defines reason to claim that while *Erie Resistor* bars employers from unlawfully favoring cross-overs with seniority benefits, the case is silent about rates of compensation. Whether the benefit is "current" or "prospective," the relevant question is

whether the employer has illegally burdened the statutory right to strike by artificially dividing the workforce into those who did not engage in strike activity and those who did. "Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained . . . ." *NLRB v. Erie Resistor Corp.*, 373 U.S. at 231, 83 S.Ct. at 1147. Such divisions, which stand "as an ever-present reminder of the dangers connected with striking and with union activities in general," *id.*, may not be countenanced under the Act because the claimed business purpose does not outweigh the necessary harm to employee rights. *See id.* at 237, 83 S.Ct. at 1150. In such cases, the nature of the particular benefit is irrelevant.[11]

Banta anticipated this conclusion by presenting two defenses to the finding that

---

pay rates. *See* J.A. 55–56, 609–64. In general, Banta employed the PRS to insulate cross-overs from the consequences of a smaller company workforce, thus returning them to their pre-strike classifications and reinstating Union members to whatever positions were left. This built-in favoritism was further advanced by Banta's efforts to accommodate cross-overs regardless of production requirements. As one plant superintendent testified at the hearing, "the fact that there were 16 strippers on November 7 doesn't reflect any decision by Management that [it] needed 16 strippers; it simply reflects that 16 strippers who were journeymen strippers crossed the line." J.A. 56.

10. A Banta official admitted at the hearing that there would have been no difference in terms of cost, efficiency, training, or subsequent shuffling of personnel had the company staffed all positions at the end of the strike according to the seniority of qualified employees. J.A. 720–24. The ALJ found that "Management's asserted business reasons for its reinstatement plan do not withstand close scrutiny" because "Management could have achieved essentially these same business objectives without drawing a line of demarcation between 'cross-overs' and returning strikers." Initial Decision, J.A. 65.

11. *See, e.g., Rogers Manufacturing Co. v. NLRB*, 486 F.2d 644, 646–48 (6th Cir. 1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974) (destructive of right to strike for employer to deny employees seeking reinstatement full credit for their previously accrued seniority); *Great Lakes Carbon Corp.*

*v. NLRB*, 360 F.2d 19, 20–21 (4th Cir. 1966) (destructive of right to strike for employer to grant employees who abandon a strike preference with respect to protection from layoff, preferred shifts, and other employment rights); *Swarco, Inc. v. NLRB*, 303 F.2d 668, 670–73 (6th Cir. 1962), *cert. denied*, 373 U.S. 931, 83 S.Ct. 1533, 10 L.Ed.2d 689 (1963) (destructive of right to strike for employer to promise pre-strike employees who abandon a strike immunity from "bumping" by later returning strikers with greater seniority). Banta posits the legality of its PRS on the Board decisions in *Bio-Science Laboratories*, 209 NLRB 796 (1974), and *Brown and Root, Inc.*, 132 NLRB 486 (1961). These cases are inapposite. The question presented in *Bio-Science* was simply whether the employer had violated the Act by rejecting the union's insistence that economic strikers be recalled and permanent replacements laid off. The Board did not address the propriety of giving reinstatement priority to employees who abandoned the strike. Although *Brown and Root* states that the Board does not require the "displacement" of "old employees" in order to make room for returning unfair labor practice strikers, 132 NLRB at 514 (Initial Decision), nothing in the opinion suggests that the term "old employees" includes former strikers who have already abandoned a strike. We need not decide here whether employers in *all* cases are barred from offering employees *any* kind of benefits in order to continue operation during an economic strike. *See Erie Resistor*, 373 U.S. at 237, 83 S.Ct. at 1150 (Harlan, J., concurring).

it was liable under the Act. We discuss these arguments in turn.

### 1. Contractual waiver of statutory rights

Banta first contends that the PRS was "negotiated and accepted by the Union," Brief for Petitioner Banta (Banta Brief) at 45, and thus constitutes a waiver of whatever statutory reinstatement rights the strikers may have had. Banta's ultimate position in the negotiations preceding the conclusion of the strike, see pp. 13–14 supra, was that it did not construe the Union's acceptance of the company's "total offer" as a waiver of any statutory rights "except to the extent such rights are waivable and have been waived by the language of the Agreement." Banta now restates this position with a slightly different emphasis, and contends that it

> specifically advised the Union that any rights under the NLRA were waived "to the extent such rights are waivable and have been waived by the language of the agreement."

Banta Brief at 45 (emphasis added).

We find this contention patently unconvincing. Banta's shift in emphasis alone indicates the weakness of the company's argument, which first depends on showing that the Union's waiver was "clear and unmistakable." Pacemaker Yacht Co. v. NLRB, 663 F.2d 455, 457 (3d Cir. 1981); see Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956). Even if employee waiver of reinstatement rights were permissible under the Act—an issue we do not reach—the waiver of statutory rights must be demonstrated by "an express statement in the contract to that effect," Drake Bakeries, Inc. v. Local 50, Bakery & Confectionery Workers, 370 U.S. 254, 265, 82 S.Ct. 1346, 1352, 8 L.Ed.2d 474 (1962). Even explicit language "will not be read expansively." Delaware Coca-Cola Bottling Co. v. General Teamster Local 326, 624 F.2d 1182, 1188 (3d

Cir. 1980). The exchanges between Banta and the Union that led to the settlement of the strike in October 1977 permit but one objective interpretation: the parties had agreed to disagree about the legality of the PRS, and the issue would be resolved in a subsequent challenge by the Union. If Banta entertained a different subjective view of the negotiations, the burden was on the company to correct what was so obviously the Union's understanding of the situation. The agreement provides absolutely no support for the suggestion that a clear and unmistakable waiver of statutory rights took place here.

### 2. Due process violations by the NLRB

Banta's second and final defense against liability under the Act is that the Board's order violates due process because the NLRB counsel explicitly and frequently asserted that the legality of the PRS depended on whether the strike concerned unfair labor practices. For example, the NLRB counsel stated:

> If this were an economic strike ... we would not be alleging the preferential reinstatement system violated Section 8(a)(3).... We are not attacking the validity of the preferential reinstatement system if it's found to have been an economic strike.

Hearing Transcript, J.A. 657.[12] As a result, Banta argues that the validity of the PRS in the context of an economic strike was neither alleged in the Complaint nor fairly and fully litigated. Although this is by far Banta's strongest argument, it too must be rejected.

The statutory reinstatement rights of economic and unfair labor practice strikers are identical, with one significant exception. During an economic strike—but not during an unfair labor practice strike—an employer may hire permanent replacements for the striking employees. See, e.g., NLRB v. Fleetwood Trailer Co., 389 U.S.

---

**12.** The ALJ frequently prodded NLRB counsel on this point, perhaps because the NLRB's position was at such odds with the theory of the Charging Party (the Union) and the understanding of the ALJ as reflected by his preliminary rulings. See, e.g., J.A. 452–54, 456, 521–22, 586, 657, 773.

375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967); *Laidlaw Corp. v. NLRB,* 414 F.2d 99, 105 (7th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). At the end of an economic strike, the employer is not required to discharge or lay off these permanent replacements in order to create vacancies for the employees seeking reinstatement. In contrast, an employer may not hire permanent replacements during the course of a strike over unfair labor practices; his employees "are entitled to immediate and nondiscriminatory reinstatement upon their unconditional offer to return to work, even if such reinstatement requires dismissal of replacements who have been hired to fill their jobs during the strike." *Banta I,* 604 F.2d at 832 n.1.

The distinction between the two kinds of strike is irrelevant, however, if the employer has not hired permanent replacements. In such a situation, both economic and unfair labor practice strikers have identical entitlements to reinstatement without discrimination on the basis of relative union activity.[13] The ALJ found, and Banta concedes, that the company hired no permanent replacements during the course of the strike. Initial Decision at 41, 60, J.A. 44, 63. *See* Banta Brief at 8 n.7. The question before the ALJ concerned Banta's reinstatement obligations toward employees who returned during as opposed to after the strike. Under these circumstances, given the absence of permanent replacements, the company's statutory duties were identical whether its employees were economic strikers or unfair labor practice strikers—and thus there was no reason for the Board to review the ALJ's finding that the strike was economic.

It is therefore evident that the violation found in this proceeding was the violation alleged in the Complaint. The Complaint alleged that Banta had violated sections 8(a)(1) and (a)(3) of the Act by engaging in the following conduct:

> On or about October 10, 1977, and thereafter, [Banta] granted, and continues to grant, preferential reinstatement rights or preferential seniority rights to jobs and rates of pay to those employees who had abandoned the above-described strike and who offered to or did return to work at [Banta] before the [Union] abandoned the strike against [Banta].

> On or about October 10, 1977, and thereafter, [Banta] denied seniority and the benefits of seniority for purposes of job assignment and rates of pay to those employees who had engaged in the strike against [Banta] until abandoned by [the Union].

Complaint, ¶ 16(a), (b), J.A. 88–89. Nothing in the Complaint suggested that the legality of this conduct depended on whether the strike concerned unfair labor practices. Banta has not suggested any claims or evidence that it would have presented to the ALJ but for NLRB counsel's emphasis on unfair labor practices,[14] and the ALJ found that Banta was not prejudiced in any way by NLRB counsel's statements at the hearing. Initial Decision at 63, J.A. 66. This is not a situation in which violations of the Act were found that had not been alleged in the Complaint, and the cases on which

---

13. Because even economic strikers retain their status as "employees," *see* note 5 *supra,* an employer may not refuse to reinstate these strikers other than for "legitimate and substantial business justifications" without unlawfully discouraging employees from exercising their rights to organize and strike. *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967) (quoting *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967)). "An employer may refuse to reinstate 'economic strikers' if the positions they left during the strike have been filled [by permanent replace-ments], although he may not discriminate on the basis of relative union activity when filling vacancies which remain when the strike is over." *Banta I,* 604 F.2d at 832 n.1.

14. Banta does suggest, and we agree, that NLRB counsel's statements probably led it to present *more* evidence than was required. *See* Banta Reply Brief at 9 n.12 ("the vast majority of testimony elicited at the hearing concerned whether a bargaining impasse existed on April 4, 1977"). Although such a waste of time and resources is highly regrettable, it hardly constitutes a violation of due process.

Banta relies are entirely distinguishable on this basis alone.[15]

Moreover, despite the comments of NLRB counsel, the ALJ's preliminary rulings must have given Banta notice that the ALJ considered the nature of the strike irrelevant to the charges against the PRS. Although subsequently reversed by the Board, the ALJ initially ruled that he would exclude background testimony about the events of April 4, 1977. It may be true that an ALJ should not "undertake to decide an issue which he alone has injected into the hearing," *NLRB v. Tamper, Inc.*, 522 F.2d 781, 790 (4th Cir. 1975), but he may "decide an uncharged violation which has been fully litigated by the parties." *Id.* In this case, the Union had also argued from the beginning of the proceeding that Banta's PRS was unlawful regardless of the legal status of the strikers.[16] All pertinent issues and allegations were exhaustively litigated at the hearing—the method and times of employee reinstatement under the PRS, the consequences for seniority and wage rates, and Banta's purported defenses of waiver and business justification. Banta thus had "a meaningful opportunity to litigate the underlying issue in the hearing," *NLRB v. Blake Construction Co.*, 663 F.2d at 279, and the company took full advantage of this opportunity.

■ Finally, although we have some sympathy for Banta's frustration at the misleading comments of NLRB counsel, we agree with the Board that counsel's comments in their entirety hardly demonstrate a coherent theory of the case on which Banta could have relied comfortably. For example, NLRB counsel initially assumed that the PRS in the context of an economic strike was unassailable because the Union had "signed" it. Hearing Transcript, J.A. 452–54. Even so, NLRB counsel refused to suggest that the Union had waived its statutory rights. *Id.*, J.A. 657. By the time NLRB counsel submitted his post-hearing brief to the ALJ, he argued that the Union had refused to waive its rights and that any attempted waiver would have been invalid because the PRS was "inherently discriminatory" under *Erie Resistor* and other cases involving economic strikes. *See* Brief for Respondent NLRB (NLRB Brief) at 46 n.18. Ultimately, of course, these shifts in position are irrelevant because the legal theories and policy conceptions of NLRB counsel are not binding on the Board:

> Congress intended that the Board should retain its judicial and policy making functions . . . . [O]nce the decision has been made to issue a complaint and to prosecute it, the General Counsel has embarked upon the judicial process which is reserved to the Board. If the General Counsel can control this process, then the General Counsel can indeed usurp the Board's responsibility for establishing policy under the Act . . . .

*Frito Co. v. NLRB*, 330 F.2d 458, 463–64 (9th Cir. 1964). As the NLRB now observes, "to hold that the Board is bound by

---

**15.** In these cases the courts have found substantial variance between the allegations and the issues contemplated in the proceeding and the violation ultimately found, particularly those involving an entirely different section of the Act. *See, e.g., NLRB v. Blake Construction Co.*, 663 F.2d at 277–78 (complaint did not allege company's failure to extend benefits of contract to nonunion employees or company's refusal to deal with union as representative of those employees); *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d at 1079, 1083, 1101 (complaint did not allege violations of section 8(a)(5) with respect to wage increases, reneging on commitments made in ongoing negotiations, or bad faith during overall conduct of negotiations); *NLRB v. Tamper, Inc.*, 522 F.2d at 788 (complaint did not allege that company discipline of employee was motivated by employee's union

activities; the company thus "did not undertake to present evidence justifying its actions," and "the parties were not advised by the Administrative Law Judge that he would try this as a separate offense").

**16.** *See, e.g.*, Union's First Amended Charge, J.A. 344–45; Hearing Transcript, J.A. 522, 803–04 ("there are many aspects of the PRS that are illegal and discriminatory regardless of the nature of the strike"). A charging party has the statutory right to "propound theories which the general counsel fails or refuses to rely upon," *International Union of Electrical Workers v. NLRB*, 289 F.2d 757, 760 (D.C.Cir.1960), and the ALJ and the Board are permitted to accept or reject these theories in their adjudicatory function. *See* note 17 *infra*.

counsel for the General Counsel's understanding or, in this case, misunderstanding of applicable law ... would be to assign to the General Counsel matters that clearly fall within the adjudicatory function of the Board." NLRB Brief at 47. We agree.[17]

Where there is a substantial difference between the Board's theory of the case and the approach of NLRB counsel, such that a party may have relied to its detriment on counsel's statements and thus failed to adduce facts or make arguments relevant to the Board's disposition, our review of alleged due process violations must be searching. "It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing." *Montgomery Ward & Co. v. NLRB*, 385 F.2d 760, 763 (8th Cir. 1967). In this case, however, Banta's contention lacks the nec-

essary critical mass. A similar argument was made and rejected in *Rogers Manufacturing Co. v. NLRB*, 486 F.2d 644 (6th Cir. 1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974), which also involved a preferential reinstatement system. In *Rogers*, as here, NLRB counsel also proceeded on a theory that the employer's post-strike conduct was illegal only if the strikers had the reinstatement rights of unfair labor practice strikers, but the ALJ and the Board found violations of sections 8(a)(1) and 8(a)(3) regardless of the nature of the strike. The Sixth Circuit summarily rejected the employer's due process claim:

> The Company also argues that the complaint herein did not allege discrimination against the strikers as economic strikers but only as unfair labor practice strikers. We are satisfied that any variance was not prejudicial.

---

17. Banta places particular stress on the line of cases holding that the General Counsel has sole statutory authority to issue unfair labor practice complaints and determine the scope of those complaints under Section 3(d) of the Act, 29 U.S.C. § 153(d). *See, e.g., Winn-Dixie Stores, Inc. v. NLRB*, 567 F.2d 1343, 1350 (5th Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (statute "leaves to the general counsel the decision as to what is and what is not at issue in an unfair labor practice hearing"); *Wellington Mill Division, West Point Mfg. Co. v. NLRB*, 330 F.2d 579, 590 (4th Cir.), *cert. denied*, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964) ("The decision as to the scope of a complaint is for the General Counsel"); *Frito Co. v. NLRB*, 330 F.2d 458, 464 (9th Cir. 1964) (General Counsel is "vested with final authority in respect to prosecution of the complaints he issues"). It is true that the Board cannot entertain an amendment to the complaint which the General Counsel opposes. *See United Steelworkers of America v. NLRB*, 393 F.2d 661, 664 (D.C.Cir.1968). We consider these cases beside the point, however, because Banta's argument ignores the adjudicatory responsibilities of the Board.

Just as the Act contemplates that administrative law judges will serve as neutral, impartial finders of fact who may not undertake "the General Counsel's prosecutorial function by ferreting out evidence of uncharged violations," *NLRB v. Tamper, Inc.*, 522 F.2d at 790, so the Act places judicial and policymaking functions with the Board, including the responsibility to determine which issues *are* within the scope of a complaint. Thus, the Board "has an obligation to decide material issues which have been fairly tried by the parties even though they

have not been specifically pleaded." *American Boiler Manufacturers Ass'n v. NLRB*, 404 F.2d 547, 556 (8th Cir. 1968), *cert. denied*, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970); *see Soule Glass & Glazing Co. v. NLRB*, 652 F.2d at 1074; *Drug Package, Inc. v. NLRB*, 570 F.2d 1340, 1345 (8th Cir. 1978); *REA Trucking Co. v. NLRB*, 439 F.2d 1065, 1066 (9th Cir. 1971). "[I]t should be observed that defining the issues which are posed by the opposing pleadings has always been regarded as a judicial function.... The proof having been admitted without objection [from the General Counsel], what is to be done with it is no longer a part of the prosecution of the cause." *Frito Co. v. NLRB*, 330 F.2d at 464–65. The Board's analysis may be tested against principles of procedural due process, of course, but "the test is one of fairness under the circumstances of each case—whether the employer knew what conduct was in issue and had a fair opportunity to present his defense." *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d at 1074. Banta's due process argument is not buttressed in the least by the claim that the Board has somehow encroached on the prosecutorial functions of the General Counsel in this case. "While the respondent was entitled to know the basis of the complaint against it, and to explain its conduct, in an effort to meet that complaint, we find from the record that it understood the issue and was afforded full opportunity to justify the action of its officers as innocent rather than discriminatory." *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 350, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938).

486 F.2d at 648. It is distressing that this sorry situation has arisen before, without apparent benefit to the NLRB counsel involved in this case, but we find no basis for reaching a different view than that expressed in *Rogers*.

CONCLUSION

With its liability based on alternative NLRB holdings, Banta has launched a barrage of attacks in this petition for review. Although we find Banta's claims without merit, it seems equally clear that the blame for much of the confusion in this case must be laid on the NLRB. It was the Board's delay in approving the Settlement Stipulation that gave Banta cause to seek withdrawal from that agreement, thus creating the complications for this litigation of *Banta I*. It was the NLRB counsel's "misunderstanding of applicable law" during the proceedings before the ALJ that gave Banta cause to argue that its due process rights had been violated. Finally, we must observe that the Board's opinion in this case is hardly a model of clarity, and that footnote 4 of that opinion poses an insolvable conundrum. Because of this inartfully drafted footnote, it is simply not possible to know whether the Board's affirmance of the ALJ is based only on the Settlement approved in *Banta I*, as Banta argues, or on the statutory requirements of the Act as well.

The explanation for the presence of footnote 4, of course, is obvious. The NLRB saw no reason to reach the ALJ's finding that the strike was economic; with this exception, the Board affirmed the ALJ's opinion "in its entirety." Whether this had the accidental effect of limiting the Board's affirmance to the basis of the Settlement rather than the Act is not a question we need to decide, however, because we are satisfied that either basis is sound. Banta's PRS was unlawful because it gave preferential reinstatement and seniority rights to one class of employees simply because those employees had abandoned the strike before the strike ended. Banta fully appreciated the nature of the charges against its PRS, and was not prejudiced by the fact that the legal issues were the same under either the Settlement or the Act. The NLRB's complication of what should have been a straightforward case has given Banta any number of apparent footholds in its challenge to the Board's order, but on careful consideration these footholds cannot be maintained. Accordingly, the Board's order must be enforced.

*Enforcement granted.*